723 A.2d 988 (1999)
Susan HAMMER and Alan Hammer, her husband, Plaintiffs-Appellants,
v.
TOWNSHIP OF LIVINGSTON and Craig D. Dufford, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued December 8, 1998.
Decided February 18, 1999.
*989 Stephen S. Weinstein, Morristown, for plaintiffs-appellants (Mr. Weinstein, attorney; Gail S. Boertzel, of counsel and on the brief).
Thomas D. Robertson, Newark, for defendants-respondents (McCarter & English, attorneys; James H. Keale, of counsel; Christopher R. Carton, on the brief).
Before Judges MUIR, Jr., EICHEN and COBURN.
The opinion of the court was delivered by EICHEN, J.A.D.
In this New Jersey Tort Claims Act case, N.J.S.A. 59:1-1 to12-3 (the Tort Claims Act), plaintiffs Susan Hammer and Alan Hammer[1] appeal from a dismissal of their complaint following a successful motion for summary judgment by defendants Township of Livingston and Craig D. Dufford, the Chief of the Livingston Fire Department. The motion judge concluded that plaintiff had not demonstrated she sustained a "permanent loss of a bodily function" or a "permanent disfigurement" that is substantial under N.J.S.A. 59:9-2(d). We reverse.
The underlying relevant facts are not in dispute. On October 27, 1994, at approximately 8:00 a.m., plaintiff, then age sixty-four, was crossing West Northfield Road in Livingston on foot when she was struck by a red fire chief station wagon operated by Fire Chief Dufford. The vehicle hit plaintiff on the left side of her body, and she was thrown, landing on her right side. The collision was of sufficient force to cause substantial damage to the station wagon.
Plaintiff was taken to Morristown Memorial Hospital where she underwent immediate surgeries to repair a severe laceration of her left knee that had penetrated into the knee joint; a soft tissue laceration of the left elbow involving the olecranon bursa; a laceration of the iliotibial band, vastus lateralis muscle and suprapatellar bursa; and numerous facial lacerations, including a one-centimeter laceration near the tear duct of plaintiff's right eye, a 0.5-centimeter laceration over the bridge of her nose, and a laceration of the lower lip approximately three centimeters long. In addition, plaintiff sustained fractures of both nasal bones, a non-displaced fracture at the top of her left fibula, and an avulsion fracture of her left olecranon bone (i.e., elbow) requiring removal of the displaced bone fragment. Following the surgeries, plaintiff was hospitalized for eight days and discharged on November 4, 1994.[2]
Dr. Robert J. D'Agostini, plaintiff's treating orthopedic surgeon, noted as early as three months after the accident that plaintiff had "regained full knee motion and ... had excellent lateral stability." On May 15, 1995, he opined in his final report that "[she] should have excellent elbow and knee function." On April 26, 1997, Dr. Alan Tillis, a second treating orthopedist, concurred in part, observing that "[plaintiff] probably has healed the lacerations to the left side of her body fairly well." Plaintiff's deposition, taken September 27, 1996, also reflects that she had no discomfort in her left elbow or left leg and that her left fibula had healed.
Nevertheless, plaintiff complains of pain on the right side of her body. Specifically, she says she has pain in her right shoulder, elbow and ankle. Plaintiff maintains that since the accident she cannot walk with or lift her grandchildren, she cannot swim anymore except for the breaststroke, and she can no longer dance or play tennis. Plaintiff also alleges that, as a result of the accident, she no longer has sexual relations with her husband and that she suffers from permanent post-traumatic stress disorder.
On January 5, 1995, Dr. D'Agostini examined plaintiff's right elbow and reported "no swelling, no tenderness" and "a full and painless range of motion and good strength," concluding that from his perspective, "nothing [was] wrong." In April 1996, Dr. Tillis *990 diagnosed post-traumatic tendinitis in plaintiff's right shoulder and ankle. Both doctors noted full range of motion in plaintiff's right shoulder. In November 1994, Dr. D'Agostini observed plaintiff had "excellent motion and gait," while Dr. Tillis noted in April 1996 that plaintiff walked with a "moderately antalgic gait."[3] X-rays were negative as reflecting any objective basis for plaintiff's right-sided complaints.
Beginning in November 1994, plaintiff was examined and diagnosed by Dr. Charles D. Semel, a psychiatrist, as suffering from post-traumatic stress disorder with severe phobic elements. In June 1996, Dr. Semel reported that although the condition "ha[d] moderated," it appeared to be "chronic" and "partially disabling." Several months later, on October 23, 1996, he described plaintiff's post-traumatic stress disorder as "characterized by elements of anxiety and depression" and that her "current level of distress ... [fell] into the mild range." He noted that "[p]rogress [was] evident[, but a] full resolution ha[d] not been achieved." In his final report, on July 29, 1997, Dr. Semel opined that "[w]ithin reasonable medical probability, [plaintiff] will remain as she is[,] less than fully recovered." He concluded that "[t]his partial disability appears to be permanent and ongoing." His report makes no mention of plaintiff's claimed sexual dysfunction except to reiterate her complaints. The only other reference to this allegation in a doctor's report is Dr. D'Agostini's observation on January 5, 1995 that he perceived no reason why plaintiff should not resume sexual activities with her husband.
Professional-quality color photographs, allegedly taken in January 1998, reveal residual scarring and swelling including a scar on plaintiff's left leg, a small scar on plaintiff's elbow, swelling around her nose,[4] and some facial scarring. Specifically, the photographs show a thin diagonal scar extending from her right lower lip to her chin and a vertical scar extending from the corner of her right eye to her nose. The scar on her left leg appears to be at least fifteen centimeters long and runs the length of her knee cap, ending in an indentation near the bottom of the scar that is discolored and mottled. The scar on her elbow is shaped like an inverted "V." Dr. D'Agostini opined in his final report that "[plaintiff] will have a permanent disfiguring scar on her knee and a smaller but still permanent scar on her left elbow." In addition, the photographs reveal a scar on Mrs. Hammer's abdomen approximately two inches in length which resulted from the excision of a mass discovered after the accident. Mrs. Hammer's doctor concluded that the accident caused the mass to form.
Defendants moved for summary judgment, asserting that plaintiff's claim for pain and suffering did not meet the threshold established by the Tort Claims Act, particularly N.J.S.A. 59:9-2(d), to permit her to recover against a public entity or its employee. On February 6, 1998, the motion judge rendered the following brief opinion from the bench:
After reviewing the moving papers, as well as the opposing papers and the arguments of counsel, this Court is of the view that first of all, that the scarring does not constitute permanent disfigurement that is substantial.
This Court further finds that this case is, indeed, distinguishable from Collins[ v. Union County Jail, 150 N.J. 407, 696 A.2d 625 (1997) ] and that the finding by Dr. Semel does not bespeak of a permanent bodily function. This Court further finds that the healed fractures do not constitute, individually, a permanent bodily function that is lost. And combined in allwith all of them, the plaintiff is not within the statute according to Brooks[ v. Odom, 150 N.J. 395, 696 A.2d 619 (1997) ]. The motion is granted.
Plaintiff contends that the judge erred in granting defendants summary judgment on her claim for pain-and-suffering damages because she has suffered injuries that constitute "permanent loss of bodily function" as well as "permanent disfigurement." Plaintiff *991 maintains that her fractures, pain on the right side of her body, and post-traumatic stress disorder, individually or taken together, constitute "a permanent loss of a bodily function." Additionally, she argues that the scars from her surgery and the swelling and disfiguration of her nose are "permanent disfigurements." Plaintiff also asserts that "looking at the totality of her injuries and the manner in which she was injured, ... the circumstances of her case are sufficiently aggravating to meet the criteria set forth in N.J.S.A. 59:9-2(d)." Defendants counter that summary judgment was proper because plaintiff failed to meet the threshold requirements of N.J.S.A. 59:9-2(d).
N.J.S.A. 59:9-2(d) of the Tort Claims Act governs claims for pain-and-suffering damages arising from personal injuries caused by public entities and their employees. That section establishes certain threshold injury requirements for recovery, providing in part:
No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical expenses are in excess of $1,000.00.
[ N.J.S.A. 59:9-2(d).]
The Act was intended to re-establish the Legislature's overriding philosophy that immunity for public entities is the general rule and liability is the exception. See Pico v. State, 116 N.J. 55, 59, 560 A.2d 1193 (1989); see also Brooks, supra, 150 N.J. at 402, 696 A.2d 619 (discussing the legislative history and intent of N.J.S.A. 59:9-2(d)). The comment to N.J.S.A. 59:9-2(d) explains that:
The limitation on the recovery of damages in subparagraph (d) reflects the policy judgment that in view of the economic burdens presently facing public entities a claimant should not be reimbursed for non-objective types of damages, such as pain and suffering, except in aggravated circumstancescases involving permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $1,000.
Brooks clarified the standard necessary to meet the threshold under N.J.S.A. 59:9-2(d). There, the Court held that in order to recover under the Tort Claims Act a claimant must sustain "a permanent loss of the use of a bodily function that is substantial." Brooks, supra, 150 N.J. at 406, 696 A.2d 619 (emphasis added).
We have carefully reviewed the record and the arguments of the parties and are persuaded that there is a total absence of objective medical evidence in the record of any permanent loss of bodily function resulting from the fractures or lacerations plaintiff sustained in the accident. Indeed, plaintiff concedes that her left fibula and left olecranon have healed completely, and she claims no loss of bodily function from her fractured nasal bones. Additionally, both of her treating orthopedists confirmed that her lacerations have healed nicely.
Similarly, plaintiff failed to present any objective medical evidence of an injury to her right elbow, shoulder or ankle that meets the requirements of N.J.S.A. 59:9-2(d) despite her subjective complaints of pain. Dr. D'Agostini examined plaintiff's right elbow in 1995 and saw "nothing wrong." When Dr. Tillis examined plaintiff in April 1996, he did not indicate any objective medical abnormality with respect to her right elbow. Absent objective medical evidence, plaintiff cannot recover pain-and-suffering damages for her right elbow. See Brooks, supra, 150 N.J. at 403, 696 A.2d 619.
Plaintiff's complaints of pain in her right shoulder and right ankle were also unsupported by objective medical evidence that either condition constituted the permanent loss of a bodily function that is substantial. Both Dr. D'Agostini and Dr. Tillis noted that, despite plaintiff's tendinitis, her shoulder did have a full range of motion. As for her ankle, although Dr. Tillis observed that "[plaintiff] walk[ed] with a moderately antalgic gait on the right," she nevertheless was able to walk. See Brooks, supra, 150 N.J. at 406, 696 A.2d 619 (observing that as long as plaintiff could still function in her *992 employment and as a homemaker, her loss was not substantial). Furthermore, despite Dr. Tillis's conclusion that plaintiff's tendinitis was "post traumatic," he did not state whether the trauma that caused the tendinitis was the collision of October 27, 1994, nor did he explain why he believed the tendinitis resulted from some trauma. In any event, there is no other evidence in the record to show that the collision caused the problems with plaintiff's right ankle. To the contrary, on November 17, 1994, only three weeks after the collision, Dr. D'Agostini examined plaintiff and observed that "she ha[d] excellent motion and gait."
We are convinced that none of plaintiff's subjective complaints regarding the right side of her body are supported by objective medical evidence; therefore, they cannot constitute a permanent loss of a bodily function that is substantial.
We are also satisfied that plaintiff's post-traumatic stress disorder claim was properly rejected because plaintiff has not demonstrated that her allegedly debilitating psychological disorder constitutes a permanent loss of a bodily function that is substantial. See Collins, supra, 150 N.J. at 423, 696 A.2d 625.
In Collins, our Supreme Court held that "an aggravating and intrusive assault" that causes a victim to sustain a permanent psychological injury may be sufficient to qualify as a "permanent loss of a bodily function" under N.J.S.A. 59:9-2(d), id. at 420, 696 A.2d 625, provided the loss is substantial and the claimant has met the $1,000 medical expense requirement, see id. at 413, 423, 696 A.2d 625. Stated differently, Collins requires "sufficiently aggravated" circumstances before liability will attach under the Tort Claims Act. Id. at 413, 696 A.2d 625.
We need not determine whether this case presents "sufficiently aggravated" circumstances to entitle plaintiff to recover pain-and-suffering damages for her psychological disorder because we conclude that plaintiff failed to produce prima facie proof that her psychological disorder was substantial. According to Dr. Semel, plaintiff's psychiatrist, her "current level of [psychological] distress" only falls into the "mild range." Although plaintiff initially suffered from flashbacks and nightmares, those conditions have "moderated." Indeed, Dr. Semel indicated in his two most recent reports that plaintiff's only permanent psychological injury is a mild level of anxiety and depression. Moreover, the record does not reflect that plaintiff is prevented by her disorder from carrying out her ordinary day-to-day functions or that she cannot live a normal life. In fact, her psychiatrist noted that she "has returned to driving and also riding as a passenger in vehicles."[5] Further, although plaintiff claims that she cannot engage in regular sexual relations with her husband, neither she nor her psychiatrist assert that her alleged sexual dysfunction is the result of her post-traumatic stress disorder. In any event, there is no evidence in the record of any physical impediment to plaintiff's engaging in sexual relations. Indeed, Dr. D'Agostini assured her there was no reason why she could not resume sexual activities with her husband. In short, plaintiff has failed to demonstrate by credible, objective medical evidence that her permanent psychological disorder is a "substantial" loss of a bodily function.
Our view is different, however, with respect to plaintiff's claim of "permanent disfigurement" under N.J.S.A. 59:9-2(d). As a threshold observation, we agree with the motion judge's conclusion that plaintiff was required to demonstrate not only that she sustained a "disfigurement" but that the disfigurement is both "permanent" and "substantial." Cf. Brooks, supra, 150 N.J. at 406, 696 A.2d 619.
To determine whether a scar constitutes "disfigurement," we apply the definition used in Falcone v. Branker, 135 N.J.Super. 137, 342 A.2d 875 (Law Div.1975). That case recognized an objective standard for determining whether a scar is a "permanent significant disfigurement" under New Jersey's original "no-fault" statute, N.J.S.A. 39:6A-8a (1972). See Falcone, supra, 135 N.J.Super. at 152, 342 A.2d 875. That standard informs our decision here. See Brooks, supra, 150 *993 N.J. at 403-04, 696 A.2d 619 (citing Thorpe v. Cohen, 258 N.J.Super. 523, 526, 610 A.2d 878 (App.Div.1992)) (observing that "[i]n some respects the threshold issue in actions against public entities is similar to the verbal-threshold issue in no-fault cases.").
In Falcone, the trial court stated that to be a "disfigurement" a scar must "impair[ ] or injure[ ] the beauty, symmetry, or appearance of a person or thing ... render[ing its bearer] unsightly, misshapen or imperfect, [or] ... deform[ing her] in some manner." Falcone, supra, 135 N.J.Super. at 145, 342 A.2d 875 (quoting Superior Mining Co. v. Industrial Comm'n, 309 Ill. 339, 141 N.E. 165, 166 (Ill.1923), an out-of-state workers' compensation case). Building on Falcone, in Puso v. Kenyon, 272 N.J.Super. 280, 639 A.2d 1120 (App.Div.1994), we observed that to qualify as a "disfigurement" under the current no-fault verbal threshold statute, N.J.S.A. 39:6A-8a, a scar must be "objectively significantly disfiguring." Puso, supra, 272 N.J.Super. at 292, 639 A.2d 1120.
In assessing the severity of the disfigurement, the Falcone court listed a number of objective factors the court should consider, namely its "appearance, coloration, existence and size." Falcone, supra, 135 N.J.Super. at 152, 342 A.2d 875. In Puso, we expanded these factors to include the "shape, characteristics of surrounding skin, the remnants of the healing process" and any other factors that might be "develop[ed] as being cosmetically important on a case-by-case basis." Puso, supra, 272 N.J.Super. at 291, 639 A.2d 1120. There, we acknowledged with approval the Falcone court's observations that not every mark or scar will be compensable as a "disfigurement." Id. at 289, 639 A.2d 1120 (quoting Falcone, supra, 135 N.J.Super. at 145, 342 A.2d 875). Compensability depends on the severity of the disfigurement.
We accept the definition of disfigurement applied in Falcone and Puso and employ the same objective factors utilized there to assess whether the disfigurement meets the verbal threshold under the No-Fault Act, N.J.S.A. 39:6A-8a. We hold, however, that, in addition, under the Tort Claims Act, a disfigurement must be "substantial" to satisfy its verbal threshold requirement, N.J.S.A. 59:9-2(d). Cf. Brooks, supra, 150 N.J. at 406, 696 A.2d 619.
We infer from the record that the motion judge reviewed the recent photographs of plaintiff's scars and considered the relevant legal principles we have discussed. Regrettably, he did not articulate his reasons for concluding that plaintiff had failed to demonstrate a prima facie case of permanent disfigurement that is substantial. Without explaining the basis for his determination, he simply stated that the scar did not meet the threshold requirements of N.J.S.A. 59:9-2(d). In doing so, he made no mention of the numerous surgeries plaintiff had undergone to repair her face, leg and elbow. Nor did he mention Dr. D'Agostini's opinion that plaintiff would have "a permanent disfiguring scar on her knee," or comment on its appearance or its size. That scar is fifteen centimeters long and runs the length of plaintiff's knee cap ending in a discolored and mottled indentation near the bottom. The judge also did not refer to the swelling of plaintiff's nose, the facial scars extending from her right lower lip to her chin and from the corner of her right eye to her nose, or the scar on her elbow which is shaped like an inverted "V." In fact, the judge did not make any findings of fact or conclusions of law, or provide any reason for his decision. As we noted in In re Will of Marinus, 201 N.J.Super. 329, 338-39, 493 A.2d 44 (App.Div.), certif. denied, 101 N.J. 332, 501 A.2d 981 (1985), the failure of the judge to find facts and state conclusions of law pursuant to R. 1:7-4 constitutes a disservice to the litigants, the attorneys and the appellate court. Although we could remand the matter to the motion judge to make the required findings, we have exercised our original jurisdiction to make our own independent determinations based on the record before us. See R. 2:10-5.
We cannot conclude, as the motion judge apparently did, that the scars, as depicted in the photographs, are so insubstantial that no rational fact-finder could determine that one or more of them "impair" plaintiff's appearance, rendering her "unsightly," "misshapen," or "imperfect," Falcone, supra, 135 N.J.Super. at 145, 342 A.2d 875. To withstand a motion for summary judgment, the *994 non-moving party need only present "competent evidential materials ... [which], when viewed in the light most favorable to [that] party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in [that party's] favor...." Brill, supra, 142 N.J. at 540, 666 A.2d 146. Here, at the very least, the record raises a factual dispute concerning plaintiff's claim that her scars constitute permanent and substantial disfigurements. In such a case, it is not the judge's function to weigh the evidence and determine the truth of the matter but only to determine whether there is such a dispute. See Brill, supra, 142 N.J. at 540, 666 A.2d 146. It is only when the evidence is so one-sided that a judge may decide that one party should prevail as a matter of law. Id. at 536, 666 A.2d 146. Consequently, the judge erred in concluding as a matter of law that plaintiff did not suffer a permanent disfigurement that is substantial. Accordingly, we reverse and remand for trial.
Defendants concede that once plaintiff demonstrates a prima facie case of either a permanent loss of a bodily function or a permanent disfigurement that is substantial, then the limitation on the recovery of pain-and-suffering damages under N.J.S.A. 59:9-2(d) does not apply and plaintiff may present evidence relating to all of her alleged permanent injuries to the jury. Cf. Puso, supra, 272 N.J.Super. at 293, 639 A.2d 1120. In light of this concession, while we take no position on its correctness, on remand plaintiff may present proof of the nature and extent of all of her injuries to the trier-of-fact. Further, because we remand for trial on plaintiff's alleged pain-and-suffering damages, we need not address or resolve plaintiff's alternative argument that, even if no single injury is found to satisfy the threshold requirements of N.J.S.A. 59:9-2(d), the totality of plaintiff's injuries may constitute sufficiently "aggravated circumstances" to justify the recovery of pain-and-suffering damages. See N.J.S.A. 59:9-2 Task Force Comment.
Reversed and remanded for trial in conformity with this opinion.
NOTES
[1] References to plaintiff in the singular refer to plaintiff Susan Hammer. Plaintiff Alan Hammer, Susan's husband, asserted a per quod claim.
[2] It is not disputed that plaintiff's medical expenses exceeded $46,000.
[3] "Antalgic" means "[a]cting to allay or prevent pain." J.E. Schmidt, Attorneys' Dictionary of Medicine and Word Finder A-213 (1962).
[4] Plaintiff contends that the fracture of her nasal bones caused her nose to swell and appear wider and that the swelling makes her right nostril look different from her left one.
[5] Plaintiff disputed this in her deposition on September 17, 1996.