791 A.2d 197

SHARON KAHRAR AND BERNARD KAHRAR, PLAINTIFFS-APPELLANTS, v. BOROUGH OF WALLINGTON, DEFENDANT-RESPONDENT.

Argued September 25, 2001—Decided February 27, 2002.

*James H. Cleary* argued the cause for appellants.

*Brian R. Martinotti* argued the cause for respondent (*Beattie Padovano*, attorneys; *James V. Zarrillo*, on the brief).

The opinion of the Court was delivered by

STEIN, J.

The issue on appeal is whether plaintiff, Sharon Kahrar, has satisfied the threshold for awarding pain and suffering damages under the Tort Claims Act, *N.J.S.A.* 59:9–2d, based on a torn rotator cuff that was surgically repaired. The Appellate Division affirmed the dismissal of plaintiff's cause of action, concluding that plaintiff's shoulder injury did not constitute a "permanent loss of a bodily function" that was "substantial," the standard adopted by this Court in *Brooks v. Odom*, 150 *N.J.* 395, 406, 696 *A.*2d 619 (1997). We hold that on the facts in this record the shoulder injury satisfies the statutory threshold requirement.

I

On June 28, 1997 at approximately 12:00 p.m., plaintiff, then 51–years–old, drove to a market in Wallington, New Jersey. Before entering the market, plaintiff decided to throw out some trash from her vehicle into a trash receptacle located across the street. Holding the trash in front of her body with both hands, plaintiff proceeded across the street without using the designated cross-walk. As she walked across the street, her right foot entered a hole in the middle of the street, causing her to fall forward on her hands and knees.

Plaintiff's foot had entered an opening seven-and-a half inches in diameter in a water valve-box area that was located two inches below the pavement's surface. Ideally, that type of valve box would be covered with a lid that sits on the valve's rim so as to be

even with the pavement above. However, in this instance, the lid cover fit improperly.

Following her fall, plaintiff noticed that she had cuts and bruises on her hands and left knee. Despite her injuries, plaintiff managed to crawl over to the side of the road. After declining the assistance of a passerby and sitting on the side of the road for a few minutes, plaintiff again gathered her trash, threw it into the receptacle and proceeded to the market as planned.

Plaintiff later informed the police of the condition in the road. When plaintiff arrived home, her daughter applied ice to her right ankle. Plaintiff's left shoulder, knee and the palms of her hands were painful. During the day her ankle swelled, her left shoulder stiffened, and she experienced increased pain in that shoulder. However, plaintiff did not seek professional medical attention until the following morning when her husband drove her to a hospital emergency room and X-rays revealed a broken elbow and right ankle. Hospital personnel placed an ace bandage on her ankle and told her to schedule a follow-up visit with the emergency room physician, Dr. Eugene Coyle.

Plaintiff was examined by Dr. Coyle within a week of the accident. She met with Dr. Coyle on a weekly basis and also received physical therapy three times a week. However, after three weeks of treatment plaintiff was still in pain. Dr. Coyle recommended that she see an orthopedist.

Plaintiff was seen by Dr. Gary Savatsky, an orthopedist, in July 1997. Dr. Savatsky took an MRI that revealed a massive tear of plaintiff's rotator cuff. Dr. Savatsky performed surgery in August 1997 to repair the torn rotator cuff. The operative record revealed that plaintiff

> had a massive tear of the cuff with entire retraction of the proximal 90% of the supraspinatus[,] [one of the muscles that make up the rotator cuff]. Roughly two-thirds of the [top of the ball portion of the shoulder] was exposed. Only the posterior aspect of the supraspinatus remained intact. There was also delamination into the tendon itself which was thickened and inflamed....
>
> The cuff tear was deemed too large to repair adequately with an arthroscopic assisted technique. Therefore, a traditional Neer skin incision was made from the

coracoid to the anterolateral acromion. The skin and subcutaneous tissues were divided down. The deltoid was taken from the anterior acromion and then split distally for 3 cm. The coracoacromial ligament was divided. A formal Neer acromioplasty [surgical removal of the anterior portion of the acromion] was performed with the above noted findings.

Consistent with the operative record, plaintiff characterized the surgical intervention as one in which "the surgeon removed a portion of the bone in her shoulder and reattached the severed tendon to the shoulder. This procedure shortened the length of the tendon which reduced the function of the patient's arm movement."

Within three weeks of surgery, Dr. Savatsky noted that plaintiff was improving. Approximately two months after surgery, Dr. Savatsky observed that plaintiff's incision was well-healed and that there was no swelling in the shoulder, although she still had pain and achiness.

However, three months after surgery Dr. Savatsky also observed that she could rotate her shoulder only twenty-five degrees, and subsequent post-operative reports described significant limitation in the movement of plaintiff's left arm. Thus, Dr. Savatsky's last and next-to-last reports—rendered 150 and 227 days after surgery—describes her forward flexion (raising of the arm forward and upward) as measuring 120 degrees, compared with 170 degrees for the right arm. Similarly, external rotation with the arm abducted (moving the arm horizontally with the elbow at the side, extending the hand sideways) measured forty-five degrees, compared with eighty degrees for the right arm. Finally, her ability to extend her arm behind her back was compromised because she was able to reach only the second of the five lumbar vertebra (lower back) with her left hand, but could extend her right arm higher to reach the eighth of the twelve thoracic vertebra (mid back).

Defendant's expert's observations also confirm the plaintiff's surgeon's post-operative reports that plaintiff's loss of motion in her left arm is medically significant. The defense's expert, Dr.

Lawrence Livingston, examined plaintiff in July 1998, approximately one year after surgery. Dr. Livingston noted that

[t]here is only 90 degrees of abduction, 100 degrees of forward flexion as compared to 180 degrees of abduction and forward flexion of the opposite shoulder. There is approximately 45 degrees of external rotation of the left shoulder, 90 degrees of the right. Internal rotation is present to the belt line on the left side and present to the mid thoracic spine on the right side with about 6″ loss of internal rotation, terminal position. There is mild weakness to the external rotation and abduction of the left shoulder. There is negative drop test. The biceps and triceps are normal. The deltoid was slightly atrophied but sensory was intact. The supra— and infrascapula fossae were non tender.

Significantly, Dr. Livingston noted that plaintiff had approximately forty percent loss of full motion in her left shoulder. Accordingly, both examining physicians agreed that plaintiff had sustained substantial motion loss in her left arm that apparently was attributable to weakness in the reattached tendon.

After surgery, plaintiff began a course of physical therapy that continued for about nine months. By the time she returned to her employment, she had missed approximately 100 days of work. Plaintiff sustained approximately $6,225 in lost wages and approximately $25,000 in medical bills.

Plaintiff returned to work as a secretary almost two months after her surgery and was noted to be performing her full duties without restrictions. Plaintiff's employment as a secretary includes typing on the computer and answering incoming telephone calls for a work force of twenty-two employees. She indicates that it takes her longer to perform her normal responsibilities and that she often requires the assistance of others to complete some of her duties.

Plaintiff, who is left hand dominant, indicates that she has had to compensate for the weakness and loss of mobility in her injured arm by using her right arm more, which often causes the right shoulder to swell. She especially experiences difficulty when performing normal household tasks, requiring her husband's or her children's assistance to clean, vacuum or move furniture. In addition to the difficulty in performing normal household tasks, plaintiff also states that she has difficulty driving, sleeping

through the night without pain, reaching certain areas of her body and continuing her hobbies that include woodworking and furniture stripping.

Plaintiff and her husband filed suit under the Tort Claims Act, *N.J.S.A.* 59:1-1 to 12-3, alleging that defendant was negligent in failing to repair and keep in good condition the surface of the roadway and failing to give any warning of the allegedly dangerous condition. Defendant filed a motion for summary judgment, claiming that plaintiff's injuries did not satisfy the threshold requirement of "permanent loss of a bodily function" set forth in *N.J.S.A.* 59:9-2d, and that the condition in the roadway was not a "dangerous condition," pursuant to *N.J.S.A.* 59:4-2.

The trial court granted summary judgment for defendant on both grounds. The trial court observed that our decision in *Brooks* required, as a predicate to recovery for pain and suffering, an injury that prevents a plaintiff from performing any or most of the tasks performed at work and at home prior to the injury. The Appellate Division disagreed with the trial court's determination on the issue of whether the recessed valve box was a dangerous condition, but affirmed the trial court's determination that plaintiff's injury was not permanent. We granted plaintiff's petition for certification to consider whether plaintiff's shoulder injury constitutes a "permanent loss of a bodily function" that satisfies the Tort Claims Act's threshold requirement. 167 *N.J.* 89, 769 *A.*2d 1052 (2001).

II

In *Willis v. Department of Conservation & Economic Development,* 55 *N.J.* 534, 540, 264 *A.*2d 34 (1970), this Court abrogated the doctrine of sovereign immunity for tort claims. In response, the Legislature adopted the Tort Claims Act in 1972, primarily to "re-establish immunity of public entities in New Jersey, on a basis more current and equitable than that which had obtained prior to *Willis.*" Harry A. Margolis & Robert Novack, *Claims Against Public Entities,* Introduction, at ix (2001). What

emerged is the general rule that public entities are immune from tort liability unless there is a specific statutory provision imposing liability. *Collins v. Union County Jail,* 150 *N.J.* 407, 413, 696 *A.*2d 625 (1997). The Tort Claims Act further limits recovery for pain and suffering damages to cases involving "permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600.00." *N.J.S.A.* 59:9–2(d). The 1972 Attorney General's Task Force on Governmental Immunity explained that

[t]he limitation on the recovery of damages ... reflects the policy judgment that in view of the economic burdens presently facing public entities a claimant should not be reimbursed for non-objective types of damages, such as pain and suffering, except in aggravated circumstances—cases involving permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of [$3,600] The limitation that pain and suffering may only be awarded when medical expenses exceed [$3,600] insures that such damages will not be awarded unless the loss is substantial.

[Comment, *N.J.S.A.* 59:9–2.]

The Court echoed that public policy in *Collins, supra,* 150 *N.J.* at 413, 696 *A.*2d 625, stating that

[w]hat emerges from the Task Force comments and the legislative expression is an intent that *N.J.S.A.* 59:9–2(d) should preclude recovery for pain and suffering based on subjective evidence or minor incidents. Where, however, there are aggravating circumstances such as the permanent loss of a bodily function, a permanent disfigurement, or dismemberment, and the medical expenses exceed [$3,600], recovery for pain and suffering may not be prohibited.

In *Brooks, supra,* 150 *N.J.* at 400, 696 *A.*2d 619, the Court elaborated on the "permanent loss of a bodily function" requirement under *N.J.S.A.* 59:9–2d. There, a New Jersey Transit bus struck the open door of the plaintiff's car, knocking her back into the car. The plaintiff arrived at the hospital complaining of pain in her neck, back and head. X-rays were taken, and she was prescribed medication, fitted for a cervical collar and discharged. The plaintiff subsequently sought treatment from a physician who administered twelve heat treatments to her back. Finding those treatments ineffective, plaintiff then came under the care of a new doctor, complaining of headaches, dizziness, blurred vision, pain and stiffness in her neck, upper and lower back, and in her left

shoulder: The plaintiff was diagnosed with " 'residual of post-traumatic myositis and fibromyositis of the cervicodorsal and lumbosacral region and post-traumatic headache syndrome.' " *Id.* at 399, 696 *A.*2d 619. Despite treatment with transcutaneous electrical nerve stimulation, the plaintiff's complaints of pain persisted.

The evidence in *Brooks* included X-rays of the plaintiff's back that revealed "small marginal spurs" and spinal curvature. An EMG indicated elevated muscle activities in her neck. *Ibid.* We also considered the plaintiff's persistent complaints of pain, muscle spasms and limited motion when performing household chores. We concluded that "[i]n reviewing the sufficiency of plaintiff's case, we accept that she experiences pain and that the limitation of motion in her neck and back is permanent." *Id.* at 406, 696 *A.*2d 619. We also explained that a partial, as well as a total, permanent loss of a bodily function would satisfy the statutory standard provided that the loss of bodily function was substantial. *Ibid.* Nonetheless, we held that the plaintiff's complaint reflected essentially a subjective claim for pain and suffering that did not rise to the level of a substantial and permanent loss of a bodily function. The Court noted that plaintiff was able to function both in her employment and as a homemaker, and concluded that she did not have a permanent loss of a bodily function within the meaning contemplated by the Legislature.

We also reviewed the legislative history underlying the Tort Claims Act and concluded that the "Legislature intended a chary interpretation of a public entity's exposure to liability." *Id.* at 402, 696 *A.*2d 619. We stated that "[t]o recover under the Act for pain and suffering, a plaintiff must prove by objective medical evidence that the injury is permanent. Temporary injuries, no matter how painful and debilitating, are not recoverable. Further, a plaintiff may not recover under the Tort Claims Act for mere 'subjective feelings of discomfort.' " *Id.* at 402–03, 696 *A.*2d 619. The Court acknowledged, however, that certain types of permanent injury,

such as "permanent loss of eyesight, taste and smell," would satisfy the statutory standard. *Id.* at 403, 696 *A.*2d 619.

Cases under the No–Fault Act also were considered in our analysis. We stated that "[t]he No Fault Act manifests legislative recognition that something less than a 'permanent loss of the use of a body organ, member, function or system' would satisfy the verbal threshold." 150 *N.J.* at 406, 696 *A.*2d 619. We clarified that in the case of the Tort Claims Act, although the Legislature did not intend to require a total loss of a bodily function, it also did not intend that "a mere limitation on a bodily function would suffice." *Ibid.*

A two-pronged test emerged from our decision in *Brooks.* To recover under the Tort Claims Act, a plaintiff must prove "(1) an objective permanent injury, and (2) a permanent loss of a bodily function that is substantial." *Gilhooley v. County of Union,* 164 *N.J.* 533, 541, 753 *A.*2d 1137 (2000).

Since our decision in *Brooks,* courts have attempted to apply correctly the substantiality requirement under the second-prong of *Brooks.* In *Hammer v. Township of Livingston,* 318 *N.J.Super.* 298, 723 *A.*2d 988 (1999), the Appellate Division ruled that a plaintiff whose fractures had healed did not demonstrate a permanent loss of a bodily function that was substantial. The sixty-four year old plaintiff was struck by a fire wagon and thrown into the air. She suffered severe lacerations to her knee, left elbow, right eye, nose and lip. She also sustained several fractures of her nose, elbow, and knee. Plaintiff underwent several operations, but her physician noted that within three months of the accident plaintiff was functioning well. Thereafter, plaintiff started to complain of pain in her right shoulder and was diagnosed with post-traumatic tendonitis. The court noted that plaintiff's gait was not limited by her injuries, and that plaintiff had acknowledged that her left fibula and left elbow had healed completely. On the issue of plaintiff's fractures, the court concluded that plaintiff had presented no objective medical evidence to satisfy the second prong of *Brooks. Id.* at 305, 723 *A.*2d 988. *See also*

*Dellisanti v. Harrison Hous. Auth.*, aff'd, 163 *N.J.* 61, 747 *A.*2d 275 (2000)(reaffirming need for objective credible evidence to satisfy the second prong of *Brooks*)

In comparison, in *Gerber v. Springfield Board Of Education*, 328 *N.J.Super.* 24, 744 *A.*2d 670, (2000), the Appellate Division ruled that a plaintiff diagnosed with nasal fractures had demonstrated a permanent loss of a bodily function that was substantial. There, plaintiff, a high school student, was attacked by a classmate. She sustained multiple nasal fractures and underwent surgery for a " 'closed reduction of nasal bone and septal fractures.' " *Id.* at 31, 744 *A.*2d 670. After surgery, the plaintiff still had difficulty breathing through her nose. Her physicians concluded that her injuries were permanent, her symptomology would worsen, and that there was no possibility that she would ever breathe normally again. *Id.* at 32, 744 *A.*2d 670. The court held that a "substantial loss of bodily function encompasses permanent and constant difficulty breathing." *Id.* at 36, 744 *A.*2d 670.

More recently in *Gilhooley, supra*, 164 *N.J.* 533, 753 *A.*2d 1137, we addressed the *Brooks* two-prong test. In *Gilhooley*, the plaintiff was employed as a clinical social worker for the United States Department of Veterans Affairs. While working in that capacity, plaintiff slipped and fell on an exit ramp as she exited the Union County jail. Doctors diagnosed a fractured nose and fractured right patella. They informed plaintiff that her "knee fracture [had] resulted in the disruption of the extensor mechanism leaving her with a complete loss of quadriceps power." *Id.* at 536, 753 *A.*2d 1137. Consequently, plaintiff underwent open reduction surgery, which required the restructuring of her patella with the use of pins and a tension band wire. Plaintiff remained in the hospital for five days and wore a leg brace for more than two months. The Appellate Division determined that because plaintiff had successful reconstructive surgery and had returned to work, her injury constituted only a temporary loss of a bodily function. *Id.* at 538, 753 *A.*2d 1137. We reversed, holding that plaintiff's fractured patella was an objective permanent injury that

caused the plaintiff "to lose forever the normal use of her knee that, thereafter, could not function without permanent pins and wires to re-establish its integrity." *Id.* at 542, 753 *A.*2d 1137. We also explained that "the Legislature intended to include within the notion of aggravated cases those involving permanent injury resulting in a permanent loss of normal bodily function even if modern medicine can supply replacement parts to mimic the natural function." *Ibid.* Thus, we concluded that plaintiff had satisfied the Tort Claims Act threshold and reversed the grant of summary judgment for defendant.

Our dissenting colleagues' reliance, *post* at 22 – 23, 791 A.2d 208 – 09), on this Court's 4–3 disposition in *Dellisanti v. Harrison Housing Authority,* 163 *N.J.* 61, 747 *A.*2d 275 (2000), is misplaced. The Court divided in *Dellisanti* on the issue whether objective evidence in the record was sufficient to sustain a causal connection between the plaintiff's wrist fracture and her subjective complaints. No such issue is presented by this record, it being undisputed that plaintiff's loss of motion in her left shoulder resulted from the massive tear of her rotator cuff.

### III

Defendant argues that plaintiff does not have a permanent loss of a bodily function that is substantial because, unlike an athlete who requires full use and rotation of the shoulder, a forty percent loss of full range of motion in plaintiff's shoulder is less significant. Defendant would, therefore, read our decision in *Brooks* and later cases as affording an advantage to non-sedentary plaintiffs. Defendant also would apply *Brooks* as a *per se* rule that would preclude a finding of permanent and substantial loss of a bodily function if the claimant still is able to function reasonably well at work and at home, irrespective of the nature or degree of permanent impairment.

Defendant's view of the Tort Claims Act's limitation on pain and suffering damages is flawed. The *Brooks* holding demonstrates that distinctions between sedentary and non-sedentary

plaintiffs in applying the Tort Claims Act standard are inappropriate. Rather, the appropriate focus is on the degree of injury and impairment. Moreover, dicta in *Brooks* should not be understood to suggest that plaintiffs with permanent and substantial impairments who, nevertheless, can manage to perform adequately routine tasks at work and at home are barred from recovery. If the loss of bodily function is permanent and substantial, as in this case, a plaintiff's eligibility to recover pain and suffering damages will not be defeated merely because she can perform some routine functions almost as well as she could prior to her injury.

In *Gilhooley, supra,* 164 *N.J.* at 541, 753 *A.*2d 1137, we noted that a determination of whether a claimant has sustained injuries sufficient to satisfy the threshold under the Tort Claims Act is fact sensitive, and, therefore, not conducive to *per se* rules. Based on the facts in this record, we hold that plaintiff's shoulder injury has satisfied the *Brooks* standard.

Plaintiff's injury reflects a comparable degree of impairment to the injury described in our opinion in *Gilhooley* where we stated that a plaintiff who permanently lost the normal function of her knee, requiring the use of modern medicine to "supply replacement parts to mimic the natural function," satisfied the pain and suffering threshold. *Id.* at 542, 753 *A.*2d 1137. We explained in *Gilhooley* that a claimant "whose vision is restored with a lens, one whose hearing is restored with a hearing aid, and one whose heart is operating efficiently with a pacemaker or implanted valve" would in no way "inhibit[ ] the characterization of that injury as the permanent loss of a bodily function." *Id.* at 543, 753 *A.*2d 1137.

Plaintiff had surgery to repair a "massive tear" of the rotator cuff. "The rotator cuff muscles work primarily to help prepare the arm for lifting and [for] movement activities." They also help to "rotate and spin the arm around in its socket." *Rotator Cuff Revealed,* Part 1: An Anatomical Review, <*http://physicaltherapy.about.com*> (visited December 17, 2001). The rotator cuff muscles are implicated whether the subject is throwing a ball,

raising a window shade, or simply reaching behind his or her back. *Id.*

The record reveals the seriousness of plaintiff's rotator cuff tear, the invasiveness of the surgery and that the reattachment of the severed tendon shortened its length. Thus, despite the successful surgery that alleviated plaintiff's pain, her ability to use her arm to complete normal tasks has been significantly impaired because plaintiff has lost approximately forty percent of the normal range of motion in her left arm. That reduction in normal function appears to be both permanent and substantial. We cannot conceivably impute to the Legislature an intention to deprive plaintiffs who sustain permanent injuries of that quality, and that are so clearly susceptible to objective medical evaluation and confirmation, of the opportunity to recover pain and suffering damages from an otherwise responsible public entity defendant. We therefore find that plaintiff has adequately demonstrated a permanent and substantial loss of a bodily function.

## IV

The judgment of the Appellate Division is reversed and the matter remanded for trial to the Law Division.

VERNIERO, J., dissenting.

Without expressly saying so, the Court has altered the analysis used to evaluate claims for non-economic damages against a public entity under the Tort Claims Act, *N.J.S.A.* 59:1-1 to 12-3 (the Act). Because the approach employed in *Brooks v. Odom,* 150 *N.J.* 395, 696 *A.*2d 619 (1997), is more in keeping with the Act than the one used here, I respectfully dissent.

## I.

A description of the Act's history is helpful in putting this case in context. Prior to 1970, the doctrine of sovereign immunity protected New Jersey from liability both in contract and in tort.

*Report of the Attorney General's Task Force on Sovereign Immunity* 21 (1972) *(Report)*. In 1970, this Court abolished that immunity in *P, T & L Construction Co. v. Commissioner, Department of Transportation,* 55 *N.J.* 341, 262 *A.*2d 195 (1970) (abrogating contract immunity), and *Willis v. Department of Conservation & Economic Development,* 55 *N.J.* 534, 264 *A.*2d 34 (1970) (abrogating immunity in tort). Recognizing that its elimination of tort immunity would have a profound impact on the State, the *Willis* Court delayed the effect of its decision until January 1, 1971, to enable the Legislature to respond. *Willis, supra,* 55 *N.J.* at 541, 264 *A.*2d 34. The Legislature twice extended that deadline. *Report* at 21. During that moratorium, the Attorney General commissioned a four-member task force (Task Force) to review the system then in place, to evaluate the systems in other jurisdictions, and to respond to *Willis. Report* at 1–2.

The Task Force noted that the theory of sovereign immunity was based on a fear that a multitude of suits by citizens could bankrupt the public treasury. *Id.* at 30. At the time of the Task Force's review, sovereign immunity already had been abrogated for local government entities and for certain categories of actions against the State. *Id.* at 31. The Task Force observed that the Legislature also had waived sovereign immunity for certain executive agencies, declaring that those agencies could "sue or be sued" by the public. *Ibid.* That piecemeal approach to sovereign immunity led the Task Force to conclude that the waiver of sovereign immunity had been "haphazard and arbitrary." *Id.* at 34.

Further, the Task Force found that the abrogation of sovereign immunity had been costly, particularly in respect of local entities. In that regard, the Task Force surveyed the State's counties and municipalities, noting that those entities that had responded to the survey had spent over one million dollars in insurance premiums and had incurred losses of over $500,000 under those policies. *Id.* at 72. Those numbers were incomplete, due to the fact that very few municipalities had responded to the Task Force's questionnaire. *Ibid.* Thus, the actual cost to taxpayers was probably

higher. The Task Force suggested that before making further changes to sovereign immunity, the Legislature should consider the fiscal impact of any such legislation on the public coffers. *Id.* at 74–75.

The Task Force then considered the experiences of other states, particularly California. *Id.* at 77. In 1961, the Supreme Court of that state had abrogated sovereign immunity. *Muskopf v. Corning Hosp. Dist.,* 55 *Cal.*2d 211, 11 *Cal.Rptr.* 89, 359 *P.*2d 457 (1961). The California legislature responded by enacting the California Tort Claims Act of 1963, *Cal. Gov't Code* §§ 810 to 996, a uniform and comprehensive statute that addressed the adjudication of liability of all public entities. *Report* at 82–83. The California statute provides that a public entity is not liable for an injury arising from an act or omission of a public entity or employee, except as specified by its provisions. *Cal. Gov't Code* § 815(a). The statute defines the specific grounds and procedures by which a plaintiff may recover against the state. *Cal. Gov't Code* §§ 810–996.

Advocates for the California approach believed that it would achieve numerous policy goals. Distilled to their essence, those goals were fourfold. First, the statute would give governing bodies a basis on which to budget for the payment of damages, thereby avoiding surprising and costly judgments. Second, it would discourage actions brought on theories yet untested in the courts. Third, it would protect generally against an increase in litigation and its costs to public entities. Fourth, it would ensure the stability of insurance premiums by providing insurers with a description of the types of circumstances that could result in a public entity's liability. *Report* at 101 (citing California Law Revision Commission, *Recommendation Relating to Sovereign Immunity* 811 (1963)). The California statute thus attempted to harmonize the sentiment against sovereign immunity with the legitimate need to protect taxpayers from a flood of costly and potentially speculative litigation.

With the California experience in mind, the Task Force recommended that

> the Legislature enact a uniform and comprehensive tort claims act providing the statutory framework for adjudicating the liability of *all public entities* throughout the State of New Jersey. This recommendation follows the basic statutory approach contained in the California Tort Claims Act of 1963. The proposed Act would *reestablish the immunity* of all public entities in the State of New Jersey *subject to liabilities* set out in reasonable detail in the statute.
>
> [*Report* at 10 (emphasis in original).]

In making that recommendation, the Task Force cited the same basic policy goals used to advance the California statute. *Id.* at 10–11. In short, the Task Force advocated that the Legislature enact a "selective and intelligent waiver of [ ] immunity." *Id.* at 8.

Our Legislature responded by adopting the Act and declaring:

> The Legislature recognizes the inherently unfair and inequitable results which occur in the strict application of the traditional doctrine of sovereign immunity. On the other hand the Legislature recognizes that while a private entrepreneur may readily be held liable for negligence within the chosen ambit of his activity, the area within which government has the power to act for the public good is almost without limit and therefore government should not have the duty to do everything that might be done. Consequently, it is hereby declared to be the public policy of this State that public entities shall only be liable for their negligence within the limitations of this act and in accordance with the fair and uniform principles established herein. All of the provisions of this act should be construed with a view to carry out the above legislative declaration.
>
> [*N.J.S.A.* 59:1–2.]

The Act reestablishes sovereign immunity by providing that, "[e]xcept as otherwise provided by this [A]ct, a public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." *N.J.S.A.* 59:2–1a. In structuring the Act in that fashion, the Legislature explicitly adopted the same policy rationales undergirding the California statute. See Comment, *N.J.S.A.* 59:2–1. Reflecting that rationale and the Act's approach in limiting liability, the Act in its official comment states: "It is hoped that in utilizing this approach the courts will exercise restraint in the acceptance of novel causes of action against public entities." Comment, *N.J.S.A.* 59:2–1.

Like the California statute, the Act delineates the specific conditions under which plaintiffs can sue public entities. The Act, however, parts company with its California counterpart (and the statutes of other states) by adding a threshold requirement that plaintiffs must satisfy before they are permitted to seek damages for pain and suffering. See *Labarrie v. Hous. Auth. of Jersey City*, 143 *N.J.Super.* 61, 64 n. 4, 362 *A.*2d 624 (Law Div.1976) (noting that Act's pain-and-suffering threshold "is not found in other tort claims acts"). In that regard, the Act provides:

No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering *shall not apply in cases of permanent loss of a bodily function,* permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600.00.

[*N.J.S.A.* 59:9-2d (emphasis added).]

That limitation

reflects the policy judgment that in view of the economic burdens presently facing public entities *a claimant should not be reimbursed for non-objective types of damages, such as pain and suffering, except in aggravated circumstances*—cases involving permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of [$3,600]. The limitation that pain and suffering may only be awarded when medical expenses exceed [$3,600] insures that such damages will not be awarded unless the loss is substantial.

[Comment, *N.J.S.A.* 59:9-2 (emphasis added).]

The inclusion of the pain-and-suffering threshold was an essential tenet of the Task Force's recommendations. *Report* at 16. It reflects the policy determination that, although claimants should be compensated for their full economic loss, they "should not be permitted in a suit against a public entity to collect for damages above and beyond those which are necessary to effectively restore [them] to the economic position occupied prior to [their] injur[ies]." *Ibid.* In furtherance of that policy, the Act not only prohibits recovery for pain and suffering except in aggravated circumstances, *N.J.S.A.* 59:9-2d; it also specifically bars awards for punitive damages, *N.J.S.A.* 59:9-2c, and damages funded through collateral sources such as insurance policies, *N.J.S.A.* 59:9-2e.

## II.

Against that backdrop, the pertinent language in *Brooks* provides that to recover non-economic damages (*i.e.*, amounts for pain and suffering), "a plaintiff must sustain a permanent loss of the use of a bodily function that is substantial." *Brooks, supra,* 150 *N.J.* at 406, 696 *A.*2d 619. In formulating that standard, the Court explained:

> To recover under the Act for pain and suffering, a plaintiff must prove by objective medical evidence that the injury is permanent. Temporary injuries, no matter how painful and debilitating, are not recoverable. Further, a plaintiff may not recover under the Tort Claims Act for mere "subjective feelings of discomfort." ... [A] claim for permanent injury consisting of "impairment of plaintiff's health and ability to participate in activities" merely iterates a claim for pain and suffering.
>
> [*Id.* at 402–03, 696 *A.*2d 619 (internal citations omitted).]

The Court also compared the Tort Claim Act's pain-and-suffering threshold to the verbal threshold in the No–Fault Act, *N.J.S.A.* 39:6A–1 to –35, observing:

> In effect, a plaintiff seeking to recover under the No–Fault Act may recover not only for "a permanent loss of the use of a body organ, member or system[,]" ... but also for the "permanent consequential limitation of use" of any such organ or member ... , or the "significant limitation or use of a body function or system[.]" ... Under the No–Fault Act, therefore, a claimant may recover for a permanent injury that merely imposes a limitation on the use of his or her [body organ]. The No–Fault Act manifests legislative recognition that something less than a "permanent loss of the use of a body organ, member, function or system" would satisfy the verbal threshold.
>
> In the Tort Claims Act, however, the Legislature did not modify the requirement of a "permanent loss of a bodily function" by stating that a mere limitation on a bodily function would suffice. Although the legislative intent in the Tort Claims Act is not completely clear, we believe that the Legislature intended that a plaintiff must sustain a permanent loss of the use of a bodily function that is substantial.
>
> [*Id.* at 405–06, 696 *A.*2d 619 (internal citations omitted).]

The plaintiff in *Brooks* suffered from stiffness, muscle spasms, back pain, loss of motion in her neck, and post-trauma headaches. *Id.* at 400, 696 *A.*2d 619. Moreover, as a result of her injury, the plaintiff experienced "severe lower back pain that radiate[d] into her left leg" and had "difficulty in performing household chores, including vacuuming, carrying groceries, or other activities that requir[ed] lifting or bending." *Ibid.* Notwithstanding those condi-

tions, the Court affirmed the grant of summary judgment in favor of the public entity, concluding:

> In reviewing the sufficiency of plaintiff's case, we accept that she experiences pain and that the limitation of motion in her neck and back is permanent. Still, she can function both in her employment and as a homemaker. In brief, she has not sustained "a permanent loss of a bodily function" within the meaning of *N.J.S.A.* 59:9–2(d).

[*Id.* at 406, 696 *A.*2d 619.]

Another decision relevant to the analysis is *Dellisanti v. Harrison Housing Authority,* 163 *N.J.* 61, 747 *A.*2d 275 (2000). In that case, this Court affirmed the disposition of the Appellate Division, which concluded that the plaintiff (who had suffered a fractured wrist accompanied by a loss of range of motion) had failed to present sufficient evidence to satisfy the Act's pain-and-suffering threshold. *Id.,* at 61, 747 *A.*2d 275 (affirming Appellate Division's decision that "plaintiff had failed to present objective credible medical evidence to establish her claims of a permanent loss of bodily function that is substantial").

Notably, the Court's ordered disposition in *Dellisanti* did not focus on the fact that the plaintiff had worn a cast, and then a brace, for about four months. Nor did we cite the fact that the plaintiff had experienced numbness in her fingers and had difficulty holding and carrying items of significant weight. Instead, the Court's order focused solely on whether objective credible evidence had established the loss of a bodily function and the linkage of that loss to the plaintiff's claims. *Ibid.*

Two decisions from the Appellate Division also illustrate the Act's high bar to recovery. In *Thorpe v. Cohen,* 258 *N.J.Super.* 523, 531, 610 *A.*2d 878 (App.Div.1992), the court upheld the dismissal of the plaintiff's claim for pain and suffering because it did not satisfy the Act's threshold requirement. In that case, the plaintiff had suffered a chronic lumbosacral sprain after allegedly being assaulted by a police officer. *Id.* at 525–26, 610 *A.*2d 878. The injury caused the plaintiff a fifteen percent permanent disability, forcing him to wear a molded corset on his lower back for some period. *Id.* at 525, 610 *A.*2d 878. The plaintiff reported

difficulty in performing basic tasks such as skiing and lifting children, but a clinical examination revealed no sensory deficits, disc herniation, or other severe problems. *Id.* at 526, 610 *A.*2d 878. Although the plaintiff's doctor acknowledged the fifteen percent disability, he saw no reason to continue treatment and deemed the plaintiff's prognosis to be satisfactory. *Ibid.*

On those facts, the Appellate Division found no basis for an award of pain and suffering. Noting that the threshold provision precludes damages for pain and suffering only, the court held that the plaintiff's injuries did not constitute an objective impairment. *Id.* at 528, 531, 610 *A.*2d 878. As a result, the plaintiff could not satisfy the threshold, thus precluding his claim for non-economic damages. *Id.* at 531, 610 *A.*2d 878.

The Appellate Division concluded similarly in *Hammer v. Township of Livingston,* 318 *N.J.Super.* 298, 723 *A.*2d 988 (1999). In that case, the plaintiff was injured after being struck by a township fire truck while crossing the street. *Id.* at 301, 723 *A.*2d 988. The plaintiff suffered severe lacerations to her knee, left elbow, eye, nose, and lip, as well as fractures of her nose, knee, and elbow. *Ibid.* After several surgeries and therapy, the plaintiff's doctor reported that she was healing well and experiencing a "painless range of motion" in her elbow and had regained the full use of the knee. *Id.* at 301–02, 723 *A.*2d 988. The plaintiff, however, was left with scarring on her knee, elbow and face, as well as posttraumatic stress disorder. *Id.* at 302–03, 723 *A.*2d 988. The plaintiff sued for pain and suffering under the Act. *Id.* at 303, 723 *A.*2d 988.

The Appellate Division found that the plaintiff's injuries were not substantial because they had healed properly and resulted in no loss of motion or bodily function. *Id.* at 305, 723 *A.*2d 988. The court found that, although the plaintiff's gait was somewhat affected by the injury, it was not "substantial" within the meaning of the statute. *Id.* at 306, 723 *A.*2d 988. However, the Appellate Division allowed the plaintiff's case to proceed, holding that there was a factual dispute in respect of whether the plaintiff's scars

from those injuries constituted permanent disfigurements under the Act. *Id.* at 310, 723 *A.*2d 988. That aspect of the statute is not before us for review.

### III.

In *Gilhooley v. County of Union,* 164 *N.J.* 533, 753 *A.*2d 1137 (2000), the Court focused not only on the loss of the bodily function (the *Gilhooley* plaintiff had injured her knee), but also on the method by which the plaintiff's injury was treated. *Id.* at 542, 753 *A.*2d 1137. Within that framework, the Court reasoned that the surgical insertion of a pin in the plaintiff's knee satisfied the Act's pain-and-suffering threshold, notwithstanding that the use of the knee had been restored fully. *Id.* at 543, 753 *A.*2d 1137.

Citing *Gilhooley,* the majority here places great emphasis on the fact that plaintiff required surgery to repair her shoulder. It concludes that "her ability to ... complete normal tasks has been significantly impaired" because of the loss of some range of motion in her left arm. *Ante* at 16, 791 *A.*2d at 205. The Court further observes that "[t]hat reduction in normal function appears to be both permanent and substantial." *Ibid.* The majority thus centers the analysis on the surgical procedure employed in repairing plaintiff's shoulder and the extent to which she may complete normal tasks. In keeping with that analysis, the Court focuses on the nature of plaintiff's injury and the method by which it was repaired, and places insufficient emphasis on whether the loss of the bodily function objectively satisfies the Act's high bar to recovery. Respectfully, the Court's approach runs the risk of lowering the Act's threshold to the point where it may no longer ensure, as the Legislature intended, that taxpayers are liable for non-economic damages only in aggravated circumstances, when a claimant's loss of a bodily function is permanent and substantial.

Perhaps as important, the facts in this case are distinguishable from those found in *Gilhooley.* As noted, the *Gilhooley* plaintiff required the insertion of a pin in her knee, prompting the Court to conclude, "when pins, wires, [ ] and devices are required to make

the plaintiff normal, the statutory standard is met. The fact that a physician has jury-rigged the knee to function with pins and wires in no way inhibits the characterization of that injury as the permanent loss of a bodily function." *Gilhooley, supra,* 164 *N.J.* at 542–43, 753 *A.*2d 1137. Here, there were no pins or similar devices used to restore the integrity of plaintiff's shoulder. Thus, by its explicit terms, *Gilhooley* does not require the majority's disposition.

I also differ in my interpretation of the medical proofs. Although Dr. Livingston did diagnose a forty percent loss of motion in plaintiff's shoulder, that condition was described in his July 13, 1998, letter to Bergen Risk Managers Inc. as "some" loss of motion, not as a "substantial" loss. He also stated that plaintiff's incision was "well healed[.]"

The post-operative notes of Dr. Savatsky contain an even more promising description of plaintiff's condition. After examining plaintiff three weeks after her surgery, Dr. Savatsky indicated that she was "out of her sling on her own volition" and "improving." He noted also that plaintiff was about to travel to Europe. Three months after the surgery, Dr. Savatsky stated: "[Plaintiff] is doing well." Five months after the surgery, the doctor reported: "She has done beautifully. Her pain is gone." Two months after that, the doctor confirmed: "[Plaintiff] is doing very well. She is working, has no significant shoulder discomfort, nor night pain."

The Court should not move beyond those proofs to consider the nature of plaintiff's rotator cuff surgery. I would agree that a series of extraordinary surgical procedures performed on a patient, *in concert with other proofs,* might support a finding that a permanent and substantial loss of a bodily function has occurred. The procedure performed here, however, was not extraordinary. See University of Iowa Health Care, *Virtual Hospital, Iowa Health Book: Orthopaedics,* at *http://www.vh.org/Patients/IHB/Ortho/Shoulder/Shoulder.html* (last visited Dec. 27, 2001) (noting that rotator cuff repair is one of four common

surgical procedures performed on shoulders). Thus, plaintiff's surgery cannot substitute for the fact that the medical proofs do not demonstrate that she has experienced the degree of aggravated, permanent, and substantial loss required to sustain a claim for non-economic damages under the Act.

Instead, plaintiff's conditions are similar in kind to those experienced by the *Brooks* claimant. Plaintiff has suffered a loss of range of motion in her shoulder, has difficulty doing certain household tasks, and experiences some pain on a daily or weekly basis (although that fact appears disputed in the medical records). Plaintiff has returned to work without restrictions. As noted by the Appellate Division, plaintiff is able to perform all of her job responsibilities, "but just in a longer amount of time than before the accident."

I do not minimize plaintiff's condition or the costs of her surgery. Assuming that she satisfies other elements of the Act, plaintiff would be entitled to full reimbursement of her medical expenses. (The Appellate Division concluded that a trial is necessary to determine whether the recessed valve box was a dangerous condition and whether plaintiff should otherwise be entitled to economic damages. Those aspects of the panel's decision are not before us for review.) For purposes of non-economic damages, however, plaintiff cannot satisfy the rigorous standard embodied in the Act.

In essence, the Act distinguishes between economic and non-economic damages, making claims for the latter more difficult to sustain. It does so to protect "the public coffers," *Brooks, supra,* 150 *N.J.* at 402, 696 *A.*2d 619, and because non-economic damages, by their nature, are more subjective and less certain than economic damages. *See* Comment, *N.J.S.A.* 59:9–2; *Ayers v. Jackson Township,* 106 *N.J.* 557, 571, 525 *A.*2d 287 (1987) (explaining that "Act's ban against recovery of damages for 'pain and suffering resulting from any injury' is intended to apply to the intangible, subjective feelings of discomfort that are associated with personal injuries"). That the Legislature would choose to treat the two

types of damages differently for purposes of recovery against a public entity is both reasonable and fair. We should not gainsay that choice, especially when public resources are scarce and the policy in favor of protecting the public fisc is so strong. See Jeff Whelan, *A Fiscal Crisis for the Books in Jersey,* Star-Ledger, Dec. 27, 2001, at A1 (reporting that "state officials now are confronting the biggest financial crisis in New Jersey's history").

In sum, I am not persuaded that plaintiff's proofs have satisfied the Act's high threshold for recovery of non-economic damages. This case falls squarely within the purview of *Brooks.* The central teaching of *Brooks* is that the loss of range of motion in plaintiff's shoulder, unfortunate as that may be, is insufficient as a matter of law to surmount the pain-and-suffering threshold. On that basis, I would affirm that part of the trial court's grant of summary judgment in favor of the public entity.

The Court holds otherwise. In so doing, it lowers the Act's bar to recovery by centering its analysis on the extent to which plaintiff may complete normal tasks and on the nature of her surgery, rather than solely on whether there has been a permanent loss of a bodily function that is substantial. That departure from *Brooks* may introduce in future cases an element of subjectivity never intended by the Act's drafters, and may further blur the distinction between economic and non-economic damages.

## IV.

Exercising restraint as urged in the Act's official comment, I would affirm the Appellate Division judgment in all respects.

*For reversal and remandment*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, and ZAZZALI—5.

*For affirmance*—Justices VERNIERO and LaVECCHIA—2.

*Opposed*—None.