935 A.2d 1218 (2007)
397 N.J. Super. 34
Angela HOAG, Plaintiff-Appellant,
v.
Commissioner Devon BROWN, New Jersey Department of Corrections and its Agents, Sco Richard Sheppard, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued September 25, 2007.
Decided November 27, 2007.
*1220 Richard E. Yaskin, Cherry Hill, argued the cause for appellant.
Mary Beth Wood, Deputy Attorney General, argued the cause for respondents (Anne Milgram, Attorney General, attorney; Nancy Kaplen, Assistant Attorney General, of counsel; Ms. Wood, on the brief).
Before Judges SKILLMAN, WINKELSTEIN and YANNOTTI.
The opinion of the court was delivered by
WINKELSTEIN, J.A.D.
Plaintiff Angela Hoag was a licensed clinical social worker employed by Correctional Medical Services, Inc. (CMS) and assigned to the Southern State Correctional Facility (Southern State) to provide mental health services for prison inmates. During her tenure at that facility, plaintiff alleges that defendant corrections officer Richard Sheppard threatened her and physically and verbally abused her.
Based on Sheppard's conduct, plaintiff sued the State under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to -49(LAD) and the New Jersey Tort *1221 Claims Act, N.J.S.A. 59:1-1 to 12-3(TCA). The parties filed cross-motions for summary judgment.[1]
The judge dismissed plaintiff's LAD hostile work environment claim on the grounds that she was not a State employee. He dismissed her TCA claim for negligent retention and supervision of Sheppard for two reasons: first, because the State was not vicariously liable for Sheppard's conduct; and second, because plaintiff failed to meet the TCA pain and suffering verbal threshold. N.J.S.A. 59:9-2d.
Plaintiff appeals from the summary judgment dismissing her complaint. She also appeals from the denial of her motion to amend the complaint to add a cause of action against the State based on public accommodation liability under the LAD.
We affirm the denial of plaintiff's motion to amend, but otherwise reverse the summary judgment dismissing her complaint.

I.

A.
The DOC is responsible for the health care of State-sentenced inmates housed in New Jersey's correctional system. To fulfill that obligation, the State issued a request for proposals (RFP) for privatization of its inmate health care system. Pursuant to the terms of the RFP, CMS contracted with the State to provide psychological and counseling services to inmates. Because the trial court dismissed plaintiff's LAD claim for lack of an employer/employee relationship between her and the State, we review in detail the responsibilities the RFP and the contract imposed on both the DOC and CMS.
CMS is responsible for developing uniform health care policies and procedures and for coordinating meetings with institutional superintendents to discuss health care services. It provides on- and off-site health care services and professional management services. The DOC provides CMS with office space, facilities, utilities, telephones, computers, fax/copy machines, and other equipment.
With respect to personnel, the "final selection of all employees or subcontractors" is subject to DOC's approval. CMS personnel are subject to a background investigation conducted by the DOC to determine suitability for initial and/or continued employment. The continued employment of CMS's staff is subject to the DOC's approval. The DOC also reserves the right to instruct CMS to prohibit its employees from performing any service under the contract. The personnel files of all CMS employees are to be kept on file at DOC institutions and made available to the institutional superintendent or his or her designee.
CMS is required to notify and consult with the DOC medical director or contract monitor prior to discharging professional staff, and the DOC retains "the ultimate right of approval/refusal and/or dismissal of an individual professional." CMS activities are to be performed in consultation with, under the direction of, and with the approval of the State's contract monitor. CMS is responsible for ensuring that its personnel are provided with orientation and training regarding medical practices on-site at the institution; orientation regarding other institutional operations is the responsibility of the institution and the DOC. CMS monitors the performance of *1222 its health care staff to ensure adequate job performance.
All full-time CMS staff are to be on-site at the institution at least forty hours per week, and are required to comply with sign-in and sign-out procedures on a DOC time-keeping form or other method approved by the DOC. CMS personnel are subject to all security regulations and procedures of the DOC and the institution, and the DOC provides security for CMS personnel "consistent with security provided NJDOC employees."
The RFP stated that a contractor's status "shall be that of any independent principal and not as an employee of the State." All contractors had to agree not to discriminate in employment and to abide by all anti-discrimination laws, including the LAD. CMS's website instructs prospective employees that they will be employees of CMS, not the state or local government with whom CMS contracts, and that CMS pays their salary and benefits.
In November 2000, CMS hired plaintiff as a staff clinical social worker to provide mental health services to the DOC psychiatric inmate population, and assigned her to Southern State. According to CMS's job description, a staff clinical social worker "[p]rovides assessment, treatment, and crisis intervention and other mental health services to . . . inmates in accordance with professional standards and licensing agreements." The social worker is accountable to the lead psychologist and must promote a positive working relationship with "Health Services, staff, prison staff and CMS administrative staff." He or she is required to comply with "employee standards of CMS and applicable employee standards of the facility."
The DOC required plaintiff to provide thirty-minute mental health therapy sessions, twice a month, to fifty to sixty "special needs" inmates assigned to her. She provided counseling to these inmates in her office, which was located in a trailer in Compound A. In her trailer, she worked in close physical proximity with DOC employees responsible for social services, parole, chaplaincy, and classification units.
Before being released to plaintiff, each inmate was checked in and searched by the correctional officer assigned to the trailer. Sheppard was the correctional officer the DOC primarily assigned to her trailer.
Plaintiff attended discharge/release committee meetings with Southern State's administration and social services departments and DOC staff meetings to report on mental health issues. In turn, DOC staff attended CMS's weekly treatment team meetings and crisis intervention and suicide prevention training sessions. Plaintiff also attended a DOC-sponsored new employee orientation, DOC training on conducting a parenting group for inmates, behavior modification training, and, together with DOC correctional officers, a mandatory teleconference training session about treating the psychiatric inmate population.
Pursuant to a May 1999 settlement of class action litigation brought by mentally ill prisoners against the DOC, the court appointed independent monitors "to facilitate and ensure [the DOC's] compliance with the terms of the Settlement Agreement." The monitors visited plaintiff's workplace four times a year and regularly interviewed her and the inmates. Her daily work was also monitored by a DOC Quality Assurance Monitor who had direct access to her computer and who regularly reviewed her progress notes, treatment plans, special reports, and e-mails.
Plaintiff was required to follow the DOC's Mental Health Services Policy and Procedures Manual. She was jointly responsible *1223 with the DOC's social workers for preparing inmate discharge plans.

B.
We next review Sheppard's conduct toward plaintiff that underlies her claims. She certified that Sheppard regularly interrupted her counseling sessions by calling her on the telephone, knocking on her office door, and walking unannounced into her office. He often cursed and made abusive comments about her or the inmates.
During her second week of employment at the facility, Sheppard berated her for the way she wrote down an inmate's name. He called her a "moron" and said, "No wonder your husband left you." He then mimicked some Italian words. Plaintiff reported the incident to the lead psychologist and head of the psychology department, Dr. Leland Mosby, who told her he would talk to "Administration."
About ten days later, Sheppard berated her again and interfered with her counseling sessions. When she came out of her office, he told her to stay inside and yelled at her not to come out again. She reported this incident to Dr. Mosby and to Dr. Maurice Rosman, the site medical administrator. Dr. Rosman reported the incident to Ronald Cathel, the prison administrator, and assured plaintiff that the problem would be resolved. A few days later, Sheppard confronted her and asked if she had "been talking to anybody." He warned her, "You better not be talking or else."
In January 2001, plaintiff stepped out of her office and asked Sheppard whether her inmate had arrived. Sheppard leaned back in his chair, opened his legs, and grabbed his genitals with his hand while smirking and saying, "This is here." She was humiliated and scared. That same month, Sheppard approached her and "eyeball[ed]" her from head to foot. He commented that she was built like his wife, "only you have bigger tits and she don't fuck." Plaintiff returned to her office and cried.
The next morning, Sheppard sniffed plaintiff and commented that she smelled like his cat litter box. Another morning, he greeted her with, "Here comes the Sicilian! There is nothing worst [sic] than a Sicilian [w]oman. . . . [N]o wonder your husband left you!" On January 25, 2001, plaintiff's birthday, Sheppard marked his desk calendar, in large red lettering, with the words, "HOAG IS 55 . . . HAPPY BIRTHDAY OLD BAG."
In February 2001, Sheppard said, in front of inmates, that plaintiff's initials, A.H., stood for "airhead" and "asshole." On another occasion he asked her why she did not "show any leg around here? Don't you shave your legs. You know what they say about Sicilian [w]omen. . . . They are hairy!" She complained to Assistant DOC Superintendent Brenda Brown about Sheppard's abusive behavior.
Sheppard's behavior worsened. On March 7, 2001, he put his hands on plaintiff and said, "You must be very lonely without a husband. Don't you miss having a man in your life?" When she stated she was happy, Sheppard replied, "How could you possibly be happy without a man in your life[,] don't you miss sex?" He asked her to go out with him; she refused.
Later that afternoon, Sheppard started pulling and feeling plaintiff's hair. He told her that her hair was dry and kinky and asked if she had "niger [sic]" in her. He then said, "You know what they say about you SiciliansYou're all niger [sic], being so close to Africa and all. . . . Are you sure there isn't any niger [sic] in your ancestory [sic]?"
*1224 On March 9, 2001, Sheppard entered plaintiff's office and asked her if she wanted to go out with him. When she refused his repeated requests, he left her office, mumbling "you god-damn women are all alike!" Later that morning, Sheppard repeatedly asked her to go out with him.
When plaintiff asked Sheppard whether one of her inmates had arrived, he moved close to her and "smacked" her face repeatedly with the back of his hand in a rapid motion, repeating and mimicking her, "Is he here? Is he here? Is he here? [T]hat's all you ever care about!" She was scared and shocked and felt violated by this behavior.
Still later that morning, when she left her office to ask Sheppard about the arrival of another inmate, in the presence of Joseph Link, a DOC assistant supervisor, Sheppard repeatedly slammed the telephone receiver on his desk and said, "I wish this was your fucking head!" He then rolled his chair to the wall while shouting, "Is he here? [W]hat are you fucking stupid! [N]o wonder your husband left you[,] you thick headed stupid jerk! You probably lost your job at Trenton State Prison because you're too stupid and can't do your work!" He told her to get out of his sight. She felt humiliated and "raped" in front of her coworker.
Link told plaintiff she would just make things worse for herself by reporting Sheppard, and nothing would happen to Sheppard if she reported him. Link said Sheppard had been getting away with similar behavior for twenty years. Patricia Lewis, an administrative assistant, told plaintiff that Sheppard had boasted he had been reimbursed for his two-week back pay following a suspension without pay when a similar incident had occurred with another female CMS employee.
That afternoon, plaintiff discussed Sheppard's behavior with Dr. Gregory Alberts, CMS's regional director of mental health. She also told Alberts about other behavior that Sheppard had engaged in that interfered with her ability to do her job, including making inappropriate comments about the inmates. Alberts wrote to a Southern State associate administrator that plaintiff had complained that Sheppard had repeatedly touched her face earlier that morning as he "simulated slapping" her. Alberts wrote that the incident was "the culmination of an approximate 2-3 month history of repeated inappropriate comments, some of which have clear sexual connotations."
Due to Sheppard's behavior and plaintiff's fear of retaliation from him, she was unable to work at Southern State after March 9, 2001, and she took a period of short-term disability. The next month she filed a formal complaint with the DOC regarding Sheppard's "sexual and ethnically harassing and abusive treatment" of her. CMS temporarily assigned her to South Woods State Prison (South Woods), pending an investigation of the allegations.
On May 15, 2001, Mary Cupo-Cruz, the director of DOC's Equal Employment Division (EED), notified plaintiff that evidence substantiated that Sheppard had engaged in conduct unbecoming a public employee and had made inappropriate remarks regarding plaintiff's marital status, ancestry, and national origin. Sheppard was served with a notice of disciplinary action charging him with conduct unbecoming, verbal abuse, discrimination/harassment, inappropriate physical contact, and threatening, harassing, coercing, or interfering "with fellow employees on State property." (emphasis added). The requested sanction was seventy-five days suspension. Plaintiff testified against Sheppard in the disciplinary proceeding. The charges against him were *1225 sustained, and he was suspended for thirty days.

C.
As a result of Sheppard's actions, in March 2001 plaintiff began treatment for anxiety attacks, sleeping problems, flashbacks, and intrusive thoughts. A doctor diagnosed her with post-traumatic stress disorder (PTSD), and in November 2003, another doctor diagnosed her as having major depression, for which he prescribed medication.
Dr. Lillian V. Kraman-Roach reported that plaintiff was re-traumatized by having to testify against Sheppard at his disciplinary proceeding. Following that testimony, her car was vandalized several times while parked at South Woods, and plaintiff suspected that it was the work of other correctional officers. After these incidents, she started having nightmares and obtained a twelve-week medical leave. She reported increased fear, more frequent nightmares, intense apprehension, and increased depression. Dr. Kraman-Roach diagnosed her with PTSD and major, recurrent, and moderate depression. Plaintiff ultimately left the New Jersey prison system and began to work with the Department of Veterans Affairs.
As of March 2005, plaintiff was still treating with Dr. Kraman-Roach. She suffered from recurrent thoughts about her trauma, bad dreams, depression, anxiety, panic attacks, agoraphobia, memory problems, indecisiveness, and lack of concentration. According to a report of Dr. Edward H. Tobe, who assessed plaintiff's post-traumatic stress level, she met the criteria for PTSD and for acute distress disorder. He opined that she had a sixty percent permanent total psychiatric disability that materially impaired "the ordinary pursuits of her life."
According to an April 2005 report of psychologist Dr. Bernard Hershenberg, plaintiff had been subjected to a Type II traumatic event, which was associated with feelings of helplessness, guilt, shame, and worthlessness. He explained that this type of trauma could cause long-standing personality and inter-personal problems, and that it has a poor recovery rate. Dr. Hershenberg opined that plaintiff's prognosis for returning to her pre-morbid level of functioning was very poor and that she was functioning in the severe range of depression. In his view, she met the criteria for a serious, permanent psychological injury.

II.
Against this factual background, we begin our discussion with plaintiff's hostile work environment claim. The trial court dismissed her claim on summary judgment because she was an employee of CMS, an independent contractor, and not an employee of the State.
A cause of action for hostile work environment based on harassment of an employee because of a trait or condition protected by the LAD requires the employee to allege conduct that would not have occurred but for the employee's protected status; the conduct must be severe or pervasive enough to make a reasonable person with that trait believe that the conditions of employment have been altered and that the working environment is hostile or abusive. Shepherd v. Hunterdon Dev. Ctr., 174 N.J. 1, 24, 803 A.2d 611 (2002); Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 603-04, 626 A.2d 445 (1993).
Unlawful employment practices under the LAD are defined in N.J.S.A. 10:5-12a. The lack of an employment relationship between a plaintiff and a defendant will preclude liability under the LAD. *1226 Thomas v. County of Camden, 386 N.J.Super. 582, 594, 902 A.2d 327 (App.Div.2006). An "employer" under the LAD includes "all persons as defined in [N.J.S.A. 10:5-5a[2]] unless otherwise specifically exempt under another section of this act, and includes the State. . . ." N.J.S.A. 10:5-5e. The term "employee" is not defined for purposes of N.J.S.A. 10:5-12a. The LAD merely states that an "employee" does not include "any individual employed in the domestic service of any person." N.J.S.A. 10:5-5f.
To determine whether plaintiff should be considered an employee of the State under the LAD, we are guided in our analysis by the LAD's purpose. It is remedial legislation, "enacted to protect not only the civil rights of individual aggrieved employees but also to protect the public's strong interest in a discrimination-free workplace." Lehmann, supra, 132 N.J. at 600, 612, 626 A.2d 445. Also informing our analysis are cases interpreting the language of the LAD, as well as decisions addressing employer liability under the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8. Feldman v. Hunterdon Radiological Assocs., 187 N.J. 228, 241, 901 A.2d 322 (2006); see also Abbamont v. Piscataway Twp. Bd. of Ed., 138 N.J. 405, 417-18, 650 A.2d 958 (1994) (principles of employer liability under LAD are "fully applicable" to CEPA action).
In the context of an individual like plaintiff, who provides professional or specialized services, "we must look beyond the label attached to the [employer/employee] relationship" to determine whether an employer/employee relationship exists for purposes of bringing a hostile work environment claim. D'Annunzio v. Prudential Ins. Co. of Am., 192 N.J. 110, 122, 927 A.2d 113 (2007). To analyze the non-traditional employment relationship, we consider the twelve factors identified in Pukowsky v. Caruso, 312 N.J.Super. 171, 182-83, 711 A.2d 398 (App.Div.1998). Id. at 114, 123, 927 A.2d 113. Those factors are:
(1) the employer's right to control the means and manner of the worker's performance; (2) the kind of occupation supervised or unsupervised; (3) skill; (4) who furnishes the equipment and workplace; (5) the length of time in which the individual has worked; (6) the method of payment; (7) the manner of termination of the work relationship; (8) whether there is annual leave; (9) whether the work is an integral part of the business of the "employer;" (10) whether the worker accrues retirement benefits; (11) whether the "employer" pays social security taxes; and (12) the intention of the parties.
[Id. at 123, 927 A.2d 113.]
The D'Annunzio Court emphasized three primary considerations when examining the non-traditional employment relationship: "(1) employer control; (2) the worker's economic dependence on the work relationship; and (3) the degree to which there has been a functional integration of the employer's business with that of the person doing the work at issue." Id. at 122, 927 A.2d 113.
Within this legal framework, we apply the Pukowsky test to the facts here. In doing so, we observe that a number of the factors overlap, and we weigh the factors qualitatively rather than quantitatively. See Chrisanthis v. County of Atlantic, 361 N.J.Super. 448, 456, 825 A.2d 1192 (App. Div.) (Pukowsky test "requires more than the listing of factors on either side of the ledger with victory going to the side garnering *1227 the most factors"), certif. denied, 178 N.J. 31, 834 A.2d 404 (2003).
The first factor is employer control, a primary consideration. D'Annunzio, supra, 192 N.J. at 122, 927 A.2d 113. We find that a jury could conclude that the State had substantial control over plaintiff's work environment. CMS's selection of employees or subcontractors is subject to DOC approval. All CMS employees' personnel files are on file with the correctional institutions and made available to the institutional superintendent. CMS is required to consult with the DOC before discharging professional staff, and the DOC has the "ultimate right" to approve of the dismissal of CMS's personnel. Plaintiff's daily work was monitored by a DOC quality assurance monitor who had direct access to plaintiff's computer, and who regularly read her progress notes, treatment plans and e-mails. She was required to follow the DOC's Mental Health Services Policy and Procedures Manual.
Plaintiff attended a State-sponsored employee orientation, training sessions mandated by the State, and conferences that were jointly attended by CMS and State employees. She attended committee meetings with prison administration and was required to attend prison staff meetings to report on mental health issues. In turn, prison staff also attended various meetings held by CMS staff. Plaintiff's job description required her to promote a positive working relationship with prison staff and to comply with employee standards of the facility at which she was assigned. She worked in close physical proximity with DOC employees.
A fair reading of the facts shows that various levels of prison officials and administrators, as well as various levels of CMS staff, supervised plaintiff's work. She reported to a number of DOC personnel and had contact with others on a regular basis. A jury could find, based on the specific circumstances here, that the DOC exercised control over plaintiff.
The second factor is whether the job was supervised or unsupervised. Id. at 123, 927 A.2d 113. Many of the same facts that apply to the DOC's control over plaintiff also apply to this factor. She was supervised not only by CMS personnel, but also by representatives of the State.
The third factor is the skill involved in plaintiff's job. Ibid. As a professional, she provided services in close proximity to other DOC employees, those responsible for social services, parole, chaplaincy, and classification units. Her skills were necessary to provide inmates with their constitutional right to adequate medical care. See J.D.A. v. N.J. Dep't of Corr., 189 N.J. 413, 414, 915 A.2d 1041 (2007) (Eighth Amendment of federal constitution includes "right of inmates to adequate medical care").
The fourth factorwho furnishes the equipment and workplace, D'Annunzio, supra, 192 N.J. at 123, 927 A.2d 113 weighs in favor of liability against the State. The State furnishes the workplace and the office supplies and equipment.
The fifth factor is the length of time plaintiff worked at the prison. Ibid. Though she was employed for a short period of time, we give little weight to this factor because to do so would penalize workers who may suffer discrimination before they can establish a lengthy tenure at their place of employment.
The sixth, eighth, tenth, and eleventh factorspayment, annual leave, retirement benefits, and social security taxes weigh in favor of finding that the State was not plaintiff's employer. These factors, however, are not entitled to great weight. Id. at 124, 927 A.2d 113. Without dispute, plaintiff was an employee of CMS, *1228 an independent contractor. The essence of an independent contractor relationship is that the worker is paid by his or her actual employer, not by the entity in charge of the work environment. Nevertheless, an employee may be considered an employee for one purpose and an independent contractor for another. See, e.g., Kurdyla v. Pinkerton Sec., 197 F.R.D. 128, 134 (D.N.J.2000) ("individual may be an employee of multiple employers under a particular statute, including anti-discrimination enactments"); MacDougall v. Weichert, 144 N.J. 380, 388, 677 A.2d 162 (1996) ("`The answer to the employment question properly varies with the varying consequences of the determination, and the public policies engaged.'") (quoting Crowe v. M & M/Mars, 242 N.J.Super. 592, 598, 577 A.2d 1278 (App.Div.), certif. denied, 122 N.J. 387, 585 A.2d 389 (1990)); Hebard v. Basking Ridge Fire Co. No. 1, 164 N.J.Super. 77, 83-84, 395 A.2d 870 (App.Div.1978) (under LAD, members of volunteer fire company were employees of both municipality and fire company), appeal dismissed, 81 N.J. 294, 405 A.2d 838 (1979). Consequently, that CMS paid her salary and benefits carries little weight in our analysis.
The seventh factor is the manner of termination of the relationship. D'Annunzio, supra, 192 N.J. at 123, 927 A.2d 113. It was CMS, not the State, that reassigned plaintiff to a different facility. Yet, the contract between CMS and the State requires CMS to notify and consult with the DOC medical director or contract monitor prior to discharging professional staff, and the DOC retains the ultimate right of dismissal of such a professional.
That takes us to the ninth factor, whether plaintiff's work was an integral part of the State's business. Ibid. This is another factor that is entitled to primary consideration. Id. at 122, 927 A.2d 113. The record could support a conclusion that plaintiff's work was an integral part of the DOC's business.
Plaintiff was required to be on site at least forty hours per week. She attended a State-sponsored employee orientation, State-mandated training sessions, and conferences jointly attended by CMS and State employees. She attended committee meetings with prison administration and was required to attend prison staff meetings to report on mental health issues. In turn, prison staff also attended various meetings held by CMS staff. Plaintiff's work was fully integrated with that of DOC personnel.
Even more significantly, plaintiff's social worker responsibilities are part of the State health care system for prison inmates, who are constitutionally entitled to adequate medical care. J.D.A., supra, 189 N.J. at 414, 915 A.2d 1041; Scott-Neal ex rel. Scott v. N.J. State Dep't of Corr., 366 N.J.Super. 570, 575-76, 841 A.2d 957 (App. Div.2004) (contracting out prison health care does not relieve State of its constitutional duty). Thus, though the delivery of mental health services to inmates is not the primary responsibility of Southern State, that being to house State prisoners, the State is nevertheless required to fulfill its constitutional duty to provide health care to its inmates, functionally integrating plaintiff's work into the State's operation of the prison system.
The federal class action settlement to which the State was a party also specifically required the State to provide mental health care services to its prison inmates. As a result of the settlement, the court assigned independent monitors to assess the quality of medical care provided to the inmates. Those monitors oversaw plaintiff's work at Southern State. The purpose of the monitors was to assure that the State, in part through the use of CMS *1229 staff, complied with the obligation to provide a certain level of health care services. That the State maintained those services by hiring an independent contractor does not change the nature of the State's duty. As the Court observed in D'Annunzio, supra:
A reasonable application [of the LAD's definition of employee] should include adjustment for the modern reality of a business world in which professionals and other workers perform regular or recurrent tasks that further the business interests of the employer's enterprise, notwithstanding that they may receive remuneration through contracts instead of through the provision of wages and benefits.
[192 N.J. at 124, 927 A.2d 113.]
See also Stomel v. City of Camden, 192 N.J. 137, 156, 927 A.2d 129 (2007) (public defender who had his own office was nevertheless engaged to fulfill municipality's public defender function required by the Municipal Public Defender's Act, N.J.S.A. 2B:24-1 to -17, and therefore could be considered an employee under CEPA).
Thus, just as the City of Camden was required to provide a public defender in Stomel, supra, 192 N.J. at 155, 927 A.2d 129, the State here is required to provide medical services to the prisoners. That the medical services were obtained through the use of an outside contractor does not mean that the services were not functionally integrated with the State's business. Incarceration, while a primary purpose of a prison facility, includes more than simply providing room and board. But see Chrisanthis, supra, 361 N.J.Super. at 461-62, 825 A.2d 1192 (finding "[p]rovision of medical services to inmates is an incidental, not integral, function of the [f]acility"). The State is both constitutionally, and by virtue of the class action settlement, required to provide services of the type supplied by plaintiff. This evidence could support a finding that plaintiff's job was functionally integrated into the State's delivery of required medical services to Southern State's inmates.
The twelfth Pukowsky factor refers to the intention of the parties. D'Annunzio, supra, 192 N.J. at 123, 927 A.2d 113. Here, that weighs in favor of the State. The contract between the State and CMS states that the parties intended that CMS would be considered an independent contractor and its employees would not be considered employees of the State. That said, the contract documents provide that the State retains the final right of approval with respect to CMS's employees, and their personnel files are to be kept on file at the correctional institution. Continued employment of CMS staff is subject to DOC approval, and all personnel are subject to DOC-conducted background investigations.
Considering the overall economic realities of the relationship between plaintiff, CMS and the DOC, the character of the relationship between the DOC and plaintiff could be considered that of an employer/employee for purposes of the LAD. Accordingly, we reverse the summary judgment dismissing plaintiff's hostile work environment claim on the ground that plaintiff was not a State employee. Nonetheless, because the State conceded the truth of plaintiff's factual allegations only for purposes of its summary judgment motion, we are unable to determine as a matter of law whether an employer/employee relationship existed between plaintiff and the State. On remand, however, plaintiff may again move for summary judgment on that issue, grounding her motion solely on uncontested material facts.

*1230 III.
We next address plaintiff's contention that the trial court erred in dismissing her claim under the TCA for negligent retention and supervision.
A public entity "is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances." N.J.S.A. 59:2-2a. This provision adopts the general concept of vicarious liability expressed by cases decided prior to the adoption of the TCA. Denis v. City of Newark, 307 N.J.Super. 304, 313, 704 A.2d 1003 (App. Div.1998). The TCA also provides, however, that "[a] public entity is not liable for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct." N.J.S.A. 59:2-10. Thus, there can be no vicarious liability by a public entity for intentional torts committed by its employees; that is, with respect to such intentional torts, the theory of respondeat superior does not apply. McDonough v. Jorda, 214 N.J.Super. 338, 350, 519 A.2d 874 (App.Div.1986), certif. denied, 110 N.J. 302, 540 A.2d 1282 (1988), cert. denied sub nom., Jorda v. City of New Brunswick, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989).
Nevertheless, a claim based on negligent hiring or negligent supervision is separate from a claim based on respondeat superior. Schultz v. Roman Catholic Archdiocese of Newark, 95 N.J. 530, 534-35, 472 A.2d 531 (1984); Cosgrove v. Lawrence, 214 N.J.Super. 670, 679, 520 A.2d 844 (Law Div.1986), aff'd, 215 N.J.Super. 561, 522 A.2d 483 (App.Div.1987). Unlike respondeat superior liability, negligent hiring covers acts committed outside the scope of employment. Cosgrove, supra, 214 N.J.Super. at 679-80, 520 A.2d 844. It is a "primary liability" tort. Cosgrove, supra, 215 N.J.Super. at 563, 522 A.2d 483; see also Adams v. City of Camden, 461 F.Supp.2d 263, 269-70 (D.N.J.2006) (citing Di Cosala ex rel. Di Cosala v. Kay, 91 N.J. 159, 450 A.2d 508 (1982) as support for claim against county for negligent hiring of police officer); DiCosala, supra, 91 N.J. at 172-74, 450 A.2d 508 (in private sector, tort of negligent hiring addresses different wrong from that sought to be redressed by respondeat superior doctrine); Pacifico v. Froggatt, 249 N.J.Super. 153, 154-55, 157, 591 A.2d 1387 (Law Div.1991) (New Jersey Transit could be liable for negligent hiring of its officers notwithstanding that public entities cannot be liable for the willful acts of its employees); Harry A. Margolis & Robert Novack, Claims Against Public Entities, comment on N.J.S.A. 59:2-10 (Gann 2007) ("Clearly this section does not prevent allocation of fault to a public entity where that entity is liable for the negligent supervision of an employee who has engaged in willful misconduct.").
When we apply these legal principles to the facts here, we conclude that the record contains sufficient evidence to create a jury question as to whether the DOC was liable for the negligent retention of Sheppard, who had an extensive disciplinary record. In January 1984, while a corrections officer recruit, he was charged with insubordination and intentional disobedience and was suspended for ten days. In December 1985, November 1986, July 1988, November 1991, and January 1995, he was reprimanded for issues related to absenteeism and for failure or refusal to work overtime. In January 1990, he was reprimanded for conduct unbecoming an employee, based on his threatening to "fuck up" a particular person if he was not relieved from the unit.
In November 1998 Sheppard was suspended for five days for racial and/or sexual *1231 harassment or discrimination, based on his referring to a Jewish social worker as a "Jewish cowgirl," asking an African-American parole counselor how much cotton he could pick in an hour, and ridiculing the speech patterns of a Hispanic vocational counselor. The charges were ultimately dismissed by the Office of Employee Relations due to a violation of Sheppard's due process rights. Though all of Sheppard's job evaluations from June 1999 to June 2002 were positive, EED complaints did not appear on an employee's performance evaluations.
After plaintiff filed her formal complaint, in April 2001, EED proceeded with an investigation. The investigatory report determined that Sheppard had used the word "nigger" in the past and had made racially derogatory comments towards inmates. Assistant Supervisor Link said Sheppard had been "getting away" with similar behavior for over twenty years. Administrative Assistant Lewis said Sheppard had been involved in a similar incident with another CMS employee.
Dr. Mosby described Sheppard as a very large and intimidating individual, with a rough and loud voice, who could be seen as offensive and terrifying. Dr. Mosby recalled Sheppard being angry on many occasions. He said it did not take much to "set [Sheppard's anger] off," and his anger would last a long time.
According to the report of R. Paul McCauley, a criminal justice expert plaintiff retained to render an opinion on the DOC's operational and personnel policies, if the DOC had followed accepted correctional agency personnel practices, Sheppard would not have been employed after January 1984 when he was first charged with insubordination as a probationary recruit. McCauley also found fault with the fact that, even after Sheppard was investigated by the EED, he continued to receive positive performance evaluations. McCauley opined that someone in Sheppard's chain of command should have known about the investigation and that it was highly likely that DOC supervisors were not adequately trained in the performance evaluation process.
McCauley also found that, despite Sheppard's prior violations for misconduct and insubordination, and his prior suspensions and reprimands, no special investigation was ever conducted. In McCauley's view, this fell below accepted criminal justice administration practices and reflected deliberate indifference. He opined that prior to October 2000 the DOC knew, or should have known, that Sheppard's conduct raised "red flags" that should have been addressed. In his opinion, the DOC's neglect amounted to deliberate indifference to the safety of plaintiff and others and contributed to unsafe and hostile working conditions. The expert further indicated that the DOC failed to exercise reasonable care in its supervision, training, monitoring, and discipline of Sheppard.
Given Sheppard's prior disciplinary history and the expert's opinion, plaintiff's claim that the DOC was negligent for retaining Sheppard survives summary judgment.

IV.
The court alternatively dismissed plaintiff's negligent retention and supervision claim for noneconomic damages on the ground that she failed to meet the pain and suffering threshold of the TCA. According to N.J.S.A. 59:9-2d,
No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in *1232 cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600.00.
Plaintiff met the monetary prong of the threshold provision. The issue is whether she met the descriptive, or verbal, prong.
The statutory limitation must be read in light of the general legislative intent in the TCA to establish immunity as the general rule and liability as the exception. Brooks v. Odom, 150 N.J. 395, 401-02, 696 A.2d 619 (1997); Collins v. Union County Jail, 150 N.J. 407, 413, 696 A.2d 625 (1997). To recover pain and suffering damages under the TCA, a plaintiff must have an objective permanent injury and a permanent loss of a bodily function that is substantial. Knowles v. Mantua Twp. Soccer Ass'n, 176 N.J. 324, 329, 823 A.2d 26 (2003); Kahrar v. Borough of Wallington, 171 N.J. 3, 12, 791 A.2d 197 (2002); Gilhooley v. County of Union, 164 N.J. 533, 540-41, 753 A.2d 1137 (2000). The loss need not, however, be "total." Brooks, supra, 150 N.J. at 406, 696 A.2d 619.
Here, plaintiff sustained psychological injuries as a result of Sheppard's actions. In Collins, supra, 150 N.J. at 412-21, 696 A.2d 625, the Court discussed the application of psychological injuries to the threshold provision of the TCA. There, the plaintiff was a prison inmate who had been raped by a corrections officer, suffering permanent psychological harm but no permanent physical harm. Id. at 410, 696 A.2d 625. The Law Division concluded that subjective symptoms of post-traumatic stress disorder were insufficient to vault the threshold and permit a claim for pain and suffering. Collins v. Union County Jail, 291 N.J.Super. 318, 324, 677 A.2d 285 (Law Div.1995). On appeal, we affirmed, holding that a plaintiff may not recover for pain and suffering as a result of a permanent psychological injury under N.J.S.A. 59:9-2d in the absence of a physical injury. Collins v. Union County Jail, 291 N.J.Super. 169, 170, 677 A.2d 210 (App.Div.1996).
The Supreme Court identified the issue as "whether the verbal threshold provision of the [TCA] . . . bars a claim of permanent psychological harm in the form of post-traumatic stress disorder caused by the rape of a prison inmate by a corrections officer." Collins, supra, 150 N.J. at 409, 696 A.2d 625. In its analysis, the Court referred to the Attorney General's 1972 Task Force Report on governmental immunity, which explained:
The limitation on the recovery of damages in subparagraph (d) reflects the policy judgment that in view of the economic burdens presently facing public entities a claimant should not be reimbursed for non-objective types of damages, such as pain and suffering, except in aggravated circumstancescases involving permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $1000.[[3]]
[Id. at 412-13, 696 A.2d 625 (emphasis added).]
In other words, the Task Force Report states that pain and suffering damages are not available to an injured party unless the injury constitutes an aggravated circumstance. As the Collins Court explained, "[w]here . . . there are aggravating circumstances such as the permanent loss of a bodily function, a permanent disfigurement, *1233 or dismemberment, and the medical expenses exceed [$3600], recovery for pain and suffering may not be prohibited." 150 N.J. at 413, 696 A.2d 625.
In arriving at its conclusion, the Court observed that "post-traumatic stress disorder and its accompanying symptoms have been recognized by other jurisdictions as objective, physical injuries." Id. at 421, 696 A.2d 625. The Court also recognized that a number of statutory provisions in this State equate psychological injuries with other personal injuries, referring to N.J.S.A. 2C:14-1f (incapacitating mental anguish qualifies as a severe personal injury to satisfy the serious bodily harm element for first-degree rape); N.J.S.A. 52:4B-2 (bodily harm pursuant to the Criminal Injuries Compensation Act includes "mental or nervous shock"); and N.J.S.A. 52:4B-37 (victim under the Crime Victim's Bill of Rights includes person who suffered "personal, physical or psychological injury"). Id. at 422, 696 A.2d 625. Consequently, the Court held that the psychological harm the plaintiff suffered in the form of post-traumatic stress disorder constituted a "permanent loss of a bodily function" within the meaning of N.J.S.A. 59:9-2d. Id. at 420, 696 A.2d 625.
In reaching its decision, the Court considered that the plaintiff had been brutally sodomized and that this constituted a "direct, violent, and invasive physical assault." Id. at 414, 696 A.2d 625. And, the Court stated that psychological and emotional injuries should be treated the same as physical injuries under N.J.S.A. 59:9-2d "when they arise in a context similar to that which precipitated [Collins's] injuries." Id. at 423, 696 A.2d 625. The Court distinguished the case from others where no aggravated event caused the psychological injuries. Id. at 413-21, 696 A.2d 625. See, e.g., Ayers v. Twp. of Jackson, 106 N.J. 557, 565, 525 A.2d 287 (1987) (emotional distress suffered from knowledge of having consumed contaminated water); Srebnik v. State, 245 N.J.Super. 344, 346-48, 585 A.2d 950 (App.Div.1991) (emotional injury suffered by wife witnessing death of her injured husband); Marion v. Borough of Manasquan, 231 N.J.Super. 320, 331-32, 555 A.2d 699 (App.Div.1989) (emotional distress suffered as result of false arrest and detainment by police).
In contrast to these cases, Collins, supra, cited with approval A.C.R. ex rel. L.R. v. Vara, 264 N.J.Super. 565, 570-72, 625 A.2d 41 (Law Div.1992), where the trial court found that the sexual molestation of children created a presumption of both serious physical and mental injury so as to satisfy the threshold requirement of N.J.S.A. 59:9-2d. 150 N.J. at 420, 696 A.2d 625. The Court stated that the "missing link" in the cases, except A.C.R., was "an aggravating and intrusive assault that allegedly caused the plaintiff to sustain a permanent psychological injury." Ibid.
Based on this language, other courts have found Collins to stand for the proposition that recovery for a permanent, serious psychological injury is dependent not only upon the seriousness of the injury, but also on the circumstances that led to the injury, such as the rape in Collins. See Hansell v. City of Atlantic City, 152 F.Supp.2d 589, 612 (D.N.J.2001) (Collins limited recovery for psychological harm to "circumstances factually `similar to that which precipitated plaintiff's injuries'") (quoting Collins, supra, 150 N.J. at 423, 696 A.2d 625), aff'd, 46 Fed.Appx. 665 (3d Cir.2002); Rocco v. N.J. Transit Rail Operations, Inc., 330 N.J.Super. 320, 332, 749 A.2d 868 (App.Div.2000) (Collins found "`missing link' to be the `aggravating and intrusive assault'" that caused permanent psychological injuries) (quoting Collins, supra, 150 N.J. at 420, 696 A.2d 625); *1234 Gerber v. Springfield Bd. of Educ., 328 N.J.Super. 24, 36, 744 A.2d 670 (App.Div. 2000) (psychological injuries assessed same as physical injuries when they stem from violent physical assault); Hammer v. Twp. of Livingston, 318 N.J.Super. 298, 306-07, 723 A.2d 988 (App.Div.1999) (same).
Nevertheless, not all courts have read Collins to require such a result. Another panel of this court has expressly declined to read Collins "as limiting recovery under [the TCA] for psychological injuries due to `direct, violent and invasive physical assault' such as criminal sodomy or rape." Willis v. Ashby, 353 N.J.Super. 104, 112, 801 A.2d 442 (App.Div.), certif. denied, 174 N.J. 547, 810 A.2d 66 (2002). In Willis, the court concluded that the plaintiffs vaulted the verbal threshold when the cause of their psychological injury was the stillborn death of their child. Id. at 109-10, 801 A.2d 442. Judge King, speaking for the court, stated that "psychological damage may flow from a negligent tort as well as from an intentional physical assault." Id. at 110, 801 A.2d 442.
We too question whether in the context of the entire opinion, Collins requires an aggravated physical assault before a plaintiff can qualify for pain and suffering damages for a substantial, permanent psychological injury. We perceive that the Court merely regarded the cause of the injuries, the rape, as a factor to be considered to determine whether the plaintiff's post-traumatic stress disorder constituted a permanent loss of a bodily function. We do not view the Court as having placed an additional burden on a plaintiff seeking damages for psychological injuries to prove not only that the injury constituted an aggravated circumstance, but also that the cause of the injury itself was aggravated. In its opinion, the Court did not expressly afford the right to damages for psychological injuries to only those plaintiffs whose injuries are caused by an aggravated event similar to a rape; but, the Court did specifically conclude that where a plaintiff demonstrates "aggravating circumstances such as the permanent loss of a bodily function, a permanent disfigurement, or dismemberment,"a direct reference to a plaintiff's injuries, not to the cause of the injuries"and the medical expenses exceed [$3600], recovery for pain and suffering may not be prohibited." Id. at 413, 696 A.2d 625 (emphasis added).
To construe the opinion to require an aggravated cause of the injury would imply that most victims of non-intentional torts, as well as victims of many intentional torts when the event causing the injury does not rise to the severity of a rape, could not recover for pain and suffering even if they sustained substantial, permanent psychological injuries. It would draw a distinction between a substantial, permanent psychological injury and a substantial, permanent physical injury, even though the Court had observed that "post-traumatic stress disorder and its accompanying symptoms have been recognized by other jurisdictions as objective, physical injuries." Id. at 421, 696 A.2d 625. We do not read Collins to demand such a result.
Nor does this view of Collins account for several subsequent Court decisions that, though decided in the context of physical rather than psychological injuries, conclude that a plaintiff qualifies for noneconomic damages under the TCA upon meeting two conditions: an objective permanent injury and a permanent loss of a bodily function that is substantial. These cases turn on the severity of the injury, not on the cause of the injury. See Knowles, supra, 176 N.J. at 331, 823 A.2d 26 (no "per se rule [is] decisive in all cases. . . . `[I]t is the nature or degree of the ongoing impairment that determines *1235 whether a specific injury meets the threshold requirement under the [TCA].'" (quoting Ponte v. Overeem, 171 N.J. 46, 53, 791 A.2d 1002 (2002)); Kahrar, supra, 171 N.J. at 12, 791 A.2d 197 (plaintiff qualifies for noneconomic damages under TCA as long as he can establish an objective permanent injury and permanent loss of bodily function that is substantial); Gilhooley, supra, 164 N.J. at 540-41, 753 A.2d 1137 (same).
Kahrar, for example, specifically cited Collins as echoing the public policy expounded in the 1972 Task Force comment; that the damages threshold limitation permits recovery for pain and suffering where "`there are aggravating circumstances such as the permanent loss of a bodily function.'" 171 N.J. at 10, 791 A.2d 197 (emphasis added) (quoting Collins, supra, 150 N.J. at 413, 696 A.2d 625). The Task Force comment does not look to the cause of the injury, just to the severity of the injury.
In our view, therefore, Collins does not stand for the proposition that an aggravated event, like a rape, is needed before a plaintiff can qualify for noneconomic damages as the result of a substantial, permanent psychological injury. Nevertheless, under the facts here, we need not base our decision solely on plaintiff's injuries. Even if Collins requires an aggravating cause of the injuries, the facts could support a conclusion that plaintiff's injuries were the result of aggravated circumstances as to qualify her for pain and suffering damages.
Sheppard not only verbally abused plaintiff, but he also threatened and physically abused her. In March 2001, he repeatedly struck her in the face with the back of his hand. He put her in fear. As a result of that incident, plaintiff filed municipal court complaints against him, charging him with harassment, disorderly conduct by the use of offensive language, lewdness and assault. Following a trial in May 2002, the municipal court judge found that Sheppard's conduct "was designed purposely to seriously annoy and place the defendant in reasonable fear under the circumstances." The court made the following factual findings:
On or about March 7, 2001 defendant touched the hair of the complainant and asked her[] whether she had "nigger" in her. On March 9, 2001 the Court finds, specifically, that the defendant smacked Angela Hoag in the face, back and forth, several times in a discussion regarding the scheduling of an inmate. Again, on the same date, defendant slammed the telephone and stated that he wished this was "your fucking head".
The victim, Angela Hoag, testified that she feared for her personal safety and the Court is satisfied that the defendant engaged in a course of conduct in a manner to seriously annoy or alarm the complainant.
. . . The Court finds specifically that the conduct of the defendant was designed purposely to seriously annoy and place the defendant in reasonable fear under the circumstances. The Court makes a guilty finding, the State having proved its case against the defendant under N.J.S.A. 2C:33-4c[.]
The Court also finds that the defendant subjected the complainant, Angela Hoag, to offensive touching under N.J.S.A. 2C:33-4b, particularly with regard to the touching her hair on one incident and slapping her face on another incident, and makes a guilty finding.
As a result of that and other offensive conduct towards plaintiff, she suffered psychological injuries, which a jury could conclude were permanent and equate to a substantial loss of bodily function. Plaintiff has been diagnosed with major depression, *1236 requiring medication. She has suffered nightmares, increased fear, intense apprehension, and increased depression. She has recurrent thoughts about her trauma, anxiety, panic attacks, agoraphobia, memory problems, indecisiveness, and lack of concentration. An expert concluded that she was subjected to a Type II traumatic event, associated with feelings of helplessness, guilt, shame, and worthlessness. In his view, she has a serious, permanent psychological injury.
Given the totality of circumstances, a jury could conclude that Sheppard's conduct constituted an aggravated event, causing plaintiff severe, permanent psychological injuries so as to remove the limitation against her suing for pain and suffering damages under the TCA.

V.
Finally, we address plaintiff's assertion that the trial court erred in precluding her from filing a public accommodation claim. The decision whether to grant a motion to amend a pleading after a responsive pleading has been filed rests within the trial court's sound discretion. Kernan v. One Wash. Park Urban Renewal Assocs., 154 N.J. 437, 457, 713 A.2d 411 (1998).
Here, plaintiff moved to amend her complaint, for the third time, in April 2006. By then, the only claims that remained in the case were against Sheppard. The State defendants had previously been dismissed on summary judgment. Trial against Sheppard was scheduled for May 2006. The court found that plaintiff acted too late. That decision was not an abuse of discretion.
Nonetheless, because we are reinstating plaintiff's hostile work environment and negligent retention and supervision claims, should plaintiff desire to pursue her public accommodation claim, she may make an appropriate application to the trial court. The judge shall reevaluate the application to determine whether reinstatement of that claim will place an undue burden on defendants. See Mercedes-Benz Credit Corp. v. Lotito, 328 N.J.Super. 491, 511-12, 746 A.2d 480 (App.Div.), certif. denied, 165 N.J. 137, 754 A.2d 1213 (2000).

VI.
In sum, we reverse the dismissal of plaintiff's LAD and TCA claims and remand for further proceedings, and we affirm the order precluding plaintiff from raising a separate public accommodation claim.
NOTES
[1] The Department of Corrections (DOC) conditionally assumed the truth of the factual allegations plaintiff set forth in her complaint and during discovery solely for purposes of its summary judgment motion.
[2] A "person" includes "individuals . . . [and] corporations. . . ." N.J.S.A. 10:5-5a.
[3] The monetary threshold was increased to $3600 effective September 21, 2000. L. 2000, c. 126, § 32.